[Civ. No. 2971. Second Appellate District, Division Two.—December 30, 1920.]

J. F. EWING, Plaintiff and Respondent, v. H. C. HAY-WARD et al., Defendants and Respondents; NEW-MARK GRAIN COMPANY (a Corporation), Defendant and Appellant.

[1] PARTNERSHIP — SINGLE TRANSACTION — SHARING OF LOSS. — An agreement to share the loss on a single transaction does not and cannot establish a partnership.

[2] PRINCIPAL AND AGENT—RELATIONSHIP—BURDEN OF PROOF.—Agency is a fact, the burden of proving which rests upon the party affirming its existence.

[3] ID. — CONTRACT WITH AGENT — BURDEN OF PROOF.—Where it is claimed that the contract was made with an agent and because thereof it is sought to charge the principal thereunder, the burden is upon the plaintiff to show that the agent had authority from the principal to enter into the contract, and this must be proved by evidence *aliunde*, and not by the declarations of the agents themselves.

[4] ID.—CONTRACT FOR SALE OF BARLEY—AGENCY—INSUFFICIENCY OF EVIDENCE.—In this action to recover on a contract for the sale of barley, the evidence was insufficient to establish the relationship of principal and agent between the parties who signed the contract and the party whom they claimed they acted for as brokers in the transaction.

[5] ID.—AGENT AND UNDISCLOSED PRINCIPAL—LIABILITY—ELECTION.—When one party to a contract deals with another as principal and afterward discovers that such party was in fact agent for an undisclosed principal, he may elect to hold either the agent, or, upon discovery, the principal, but he cannot hold both, the agent being liable because credit was originally extended to him in the belief that he was acting for himself and the undisclosed principal being liable on the theory that, having received the benefit of the contract made by his agent, he should assume its burdens.

APPEAL from a judgment of the Superior Court of Imperial County. Franklin J. Cole, Judge. Reversed.

5. Commencing action or taking judgment against either an undisclosed principal or his agent as a bar to a subsequent action against the other, notes, 8 Ann. Cas. 1026; 17 Ann. Cas. 614; 21 L. R. A. (N. S.) 786.

The facts are stated in the opinion of the court.

Emery & Rehart for Appellant.

Frank Birkhauser for Respondent.

THOMAS, J.—Neither party to this appeal has given us any statement of the case. We have, therefore, been put to the labor of going through the pleadings, findings, etc., to get as best we could an understanding as to what the controversy is about.

As near as we have been able to ascertain from the record before us, the action is brought by plaintiff to recover on a certain contract, alleged to have been entered into between plaintiff and a copartnership doing business in Imperial County, this state, under the firm name and style of Hayward, Rath & Marshall, which copartnership, according to the allegations of the complaint, was and still is the local agent of appellant, the Newmark Grain Company. The contract referred to reads: "No. 54. Store and Field Confirmation and Purchase. May 11th, 1918. We, the undersigned, have this day entered into the following agreement, namely, to buy and sell the following named commodity: (Approximately) 800 sacks No. 1 feed barley, price $2.85 per cwt., 45# to bu., f. o. b. cars Rockwood, Calif. Terms, cash on delivery of grain. Certified public scale tag weights to govern. Seller agrees to furnish loader's affidavit as to the number of sacks loaded into car or cars. Settlement made through the buyer's and seller's banks only. Signed by the buyer, Hayward, Rath & Marshall, per M. C. Hayward. Signed by the seller, J. F. Ewing, per. Witnessed by Mrs. J. F. Ewing. Note: *Subject to our office confirmation.*" (Italics ours.) Nothing appears in the record, to which our attention has been called, to explain what or who is meant by the sentence above italicized. At the time the agreement was entered into not one word was said by anyone that the firm was acting as agent for anybody. Plaintiff testified that he supposed he was dealing with the firm there named only; nor was he depending upon evidence of any "holding out" or ostensible agency relationship on the part of that firm.

After the agreement was entered into, plaintiff, upon threshing his barley, tendered the same to Hayward, Rath & Marshall, the firm named in the contract, which tender was refused for reasons hereinafter shown. Thereupon plaintiff made an honest effort to sell at the same price elsewhere, but failed to do so, for the reason that the market had declined, the best offer received by him for his barley being $2.15 per hundredweight. The action was then brought to recover the difference between the amount actually received for the barley and that which the firm contracted to pay, as set forth in the contract above quoted.

The complaint alleges that plaintiff has performed all the terms and conditions of said contract on his part to be performed. The answer of the defendant copartnership and of the defendants Hayward, Rath and Marshall admits the making of the contract in question, but alleges that the same was made by them as brokers; while the answer of the Newmark Grain Company puts in issue every allegation of the complaint. On the issues thus formed the case went to trial, the court finding against all the defendants jointly for the sum of $495.52.

Before proceeding with a consideration of the questions raised on this appeal, attention is called to the fact that a finding that the defendants are jointly liable in this case could have been entered only in the event that they were shown to have been partners, and partnership between the firm signing the agreement and this appealing defendant was not an issue before the trial court.

The first point urged for reversal of the judgment is that no agency was proven. Plaintiff himself testified to the execution of the agreement in question; that at the time of its execution neither Mr. Hayward, of the firm of Hayward, Rath & Marshall, nor anyone connected with that firm, informed plaintiff as to whom the copartnership was buying for, or whether or not they were in fact agents for anyone; that on June 1, 1918, when plaintiff attempted to deliver the barley referred to in said agreement, Mr. Hayward informed plaintiff that he, Mr. Hayward, had turned the matter over to Mr. Rath, and that the latter would take charge of the contracts, and that plaintiff then drove to El Centro, where he saw Mr. Rath. As to

what transpired between Mr. Rath and plaintiff at El
Centro, we are not informed. Plaintiff also testified that
neither the Newmark Grain Company nor Hayward, Rath
& Marshall ever recognized the contract or agreement in
any manner, and that he was told by a member of the
copartnership that the reason that firm could not accept
the barley on their part was that they were acting for
Newmark; that they could not get him to take it off their
hands; that they were unable to dispose of it at the price
named in the agreement, and that they were quitting on
orders from Newmark.

On June 15, 1918, according to plaintiff's testimony,
Hayward gave plaintiff a note, sending him "over to
Newmark Grain Company with it," at which place he de-
livered the same to a Mr. Shank. Omitting the heading,
this note is as follows:

"Brawley, California, June 15th, 1918.
"Newmark Grain Co., Brawley, Calif.

"Dear Sir: Mr. J. F. Ewing has just come in with
100 sax barley, which was part of your contract with us.
I can't take it in here, so am sending it to you, as I have
no shipping instructions covering same. You may have.
"HAYWARD, RATH & MARSHALL, H."

On the presentation of this note to Mr. Shank—pre-
sumably in charge of the Newmark Grain Company's place
of business at Brawley—a Mr. Wolz wrote the following
answer:

"Hayward, Rath & Marshall:

"We have no barley bought from Mr. Ewing, nor do
I know anything about this being any part of any con-
tract between Hayward, Rath & Marshall and the Newmark
Grain Co., & cannot store this barley for you.
"Yours truly,
"F. A. WOLZ."

As to the connection of Mr. Shank and Mr. Wolz with
the defendant corporation, however, we are given no light,
except as we may conjecture.

The witness Hayward, testifying for plaintiff, said that
he was buying for the Newmark Grain Company, and that
he had previously bought grain at Brawley and shipped it

to that company, which grain was received, accepted, and paid for by the latter. In regard to, a conversation had with Mr. M. N. Newmark, of the Newmark Grain Company, on the night of May 10, 1918, wherein the latter talked about buying a considerable amount of barley, Hayward testified as follows: "I told them I had bought that day through the instruction of Mr. Rath to start to buy at $2.85. I had purchased whatever the amount was, I don't recollect just now what the amount was; I turned that over to Mr. Newmark and told him I would get 6,000 more sacks Saturday, and he told me to go ahead and buy it, and the conversation was general what we should do if the price went up, and what we should do if it went down, and any further instructions I was to get from Mr. Rath. If there was any change in the order to stop buying, I was to get that from Mr. Rath." This witness also testified that Newmark gave him orders to purchase 6,000 sacks of barley at $2.85 per hundredweight, and as to the grain the orders for which he claims were turned over to Mr. Newmark on Friday evening, May 10, 1918, at the Barbara Worth Hotel, in El Centro, that it was bought on the orders of and for Mr. Newmark.

The witness Rath, also testifying for plaintiff, said that Mr. Newmark notified him to inform Mr. Hayward that "the deal was off"; that in their conversation with Mr. Newmark about buying grain, plaintiff's name was not mentioned; that the witness had stated to Hayward, in the presence of Mr. Newmark, that they (Hayward, Rath & Marshall) were going to represent the "Newmark Company," and any further information or data that Mr. Newmark wanted. Mr. Hayward should feel free in posting him thereon, and that Mr. Newmark "afterward remarked to me that that was a very liberal introduction." In answer to the question, "what relation did Mr. Newmark sustain to the Newmark Grain Company?" put to Mr. Rath on cross-examination, the witness replied: "My impression is that he is president of the Newmark Grain Company"; and volunteered the further information that Mr. Newmark transacts all business for the Newmark Grain Company, and that he, Rath, had had dealings with Mr. Newmark which the corporation thereafter "carried out and paid for."

Unless the "Newmark Company" and the "Newmark Grain Company" are different names for the same concern, being used interchangeably—and there is nothing in the record to show that such is the case—the silence of Mr. Newmark, assuming him to be president of the latter named concern, cannot militate against that corporation, for the reason that when Mr. Rath spoke to Mr. Hayward concerning a firm with which it is not even insinuated that Mr. Newmark had any connection, namely, the "Newmark Company," the latter was under no obligation to speak. Furthermore, the impression of Mr. Rath that Newmark was president of any company is but a conclusion, and being such is incompetent. The purported information volunteered by him as to his dealings with Newmark, and that the deals thus entered into were carried out by the Newmark Grain Company, does not even intimate that any agency existed between the copartnership and the corporation heretofore referred to. Nor would the facts brought out by the volunteer statement prove that Mr. Newmark was the president of the corporation.

Testifying for the defendants, Newmark stated that "between 8 and 9 in the morning of the 11th of May, 1918," he gave orders to Rath not to buy any more grain at the present time, "expecting us to buy it of him." This was eleven or twelve hours before plaintiff claims to have executed the agreement in controversy, and the testimony is uncontradicted. With reference to some barley which had previously been bought by Mr. Rath from a Japanese—one Yukewa—Mr. Newmark testified that "three or four weeks after this barley had been bought Mr. Rath explained in a letter to the firm that the reason he didn't want to tell me about the purchase of this barley, I felt so bad he did not want me to feel any worse." He also testified that he never authorized Hayward, Rath & Marshall to act as agents for him. During his conversation with Mr. Rath in the Barbara Worth Hotel, at El Centro, on Saturday night, May 11, 1918, in the presence of a Mr. Seligman, at which time Mr. Rath told Newmark about buying 6,000 bags of choice barley from a Japanese at $2.85 per hundredweight, Newmark says that he asked Rath the following question: "How did you come to buy that after giving you strict instructions not to

buy any barley, expecting us to take it?" to which Mr. Rath replied that "he was compromised with the man and had agreed to take it"; whereupon he, Newmark, said to Rath: "To show you I am a sport, if Mr. Seligman is willing we will let you take this barley and handle it on a joint account, that is, each one to stand their proportion of the loss on this purchase." In addition to the foregoing, respondent claims that while the witness Rath was being cross-examined by the attorney for the defendant corporation, Mr. Newmark stated, in open court, as follows: "I grant you everything you say. We don't need this testimony of the orders, or the attorney trying to draw the thing out for an hour or so; it doesn't gain anything. I agree with Mr. Rath that we gave him orders to ship, and what is the use of bringing these documents [telegrams] up here? It won't do you any good or the attorneys either."

Respondent contends that the agency "was clearly established, not only by the declarations of the agents, but likewise by written communications passing between the Newmark Grain Company and the agents," as also by the declarations above set forth, the last of which respondent designates as an "admission." But, to establish such agency before this court, none of the written communications referred to is set forth in the record before us. We are really at a loss to understand how, under our statute, the agreement by Mr. Newmark to share the loss in relation to one isolated transaction can prove the existence of either an agency or partnership agreement between the copartnership firm and the defendant corporation. Indeed, if any relation were created at all, it would, in our opinion, be with Newmark personally. Section 2395 of the Civil Code defines partnership as the "association of two or more persons, for the purpose of carrying on business together, and dividing its profits between them." In the construction of this section our courts have held that, by agreement in some way, each party must share in the losses as well as the profits (*Wheeler* v. *Farmer*, 38 Cal. 203); for there is an equal liability for the losses which the law will imply. (*Irvine & Muir L. Co.* v. *Holmes*, 26 Cal. App. 453, [147 Pac. 229].) **[1]** An

agreement to share the loss on a single transaction does not and cannot establish a partnership.

So far as the "admission" is concerned, there is nothing in the record to which our attention has been called that could have compromised Mr. Newmark personally or the Newmark Grain Company. There is no explanation as to whom it was understood Newmark referred when he spoke of "expecting *us* to buy it of him"; or whom he was understood to speak for when he said "*we* will let you take this barley and handle it on a joint account, that is, each one to stand their proportion of the loss on this purchase"; or what "*firm*" he referred to when he testified that Mr. Rath had written "to the firm" his reasons for not wanting to tell Newmark about the purchase of certain barley; or, finally, when he made, in open court, the "admission" already quoted, wherein it is claimed he said: "I agree with Mr. Rath that *we* gave him orders to ship," etc. The only reasonable construction that can be given this testimony, therefore, is when it is considered in the light of *all* the testimony and the subjects under discussion at the time of the conversations in reference to which the ambiguity appears. So construed, the "us" and the "we" first above italicized will be seen to be none other than Mr. Seligman and Mr. Newmark, and the "firm" the corporation in which Newmark testified that he had an interest, namely, the Great Western Milling Company; while the "we," employed by Mr. Newmark in his so-called "admission," must have referred to none other than himself and those "whom he represented or had connections with what led to the allied interests"—parties whose names are not disclosed by the record. If this be so, then the evidence wholly fails to establish any authority of the firm of Hayward, Rath & Marshall that would constitute them agents of this appellant.

As we have seen, the evidence establishes no partnership. Had such been the case, however, that is, had such a partnership existed, evidence of that fact would have been inadmissible, for the reason already stated—the absence of any such issue.

[2] Agency is a fact the burden of proving which rests upon the party affirming its existence. (*Nofsinger* v. *Goldman,* 122 Cal. 609, [55 Pac. 425].) In this case

that party is the plaintiff. [3] Where, as here, it is claimed that the contract was made with an agent, and because whereof it is sought to charge the principal thereunder, the burden is upon the plaintiff to show that the agent had authority from the principal to enter into the contract. This must be proved by evidence *aliunde,* and not by the declarations of the agents themselves. (*Petterson* v. *Stockton etc. Co.,* 134 Cal. 244, [66 Pac. 304]; *Ferris* v. *Baker,* 127 Cal. 520, [59 Pac. 937]; *Smith* v. *Liverpool etc. Ins. Co.,* 107 Cal. 432, [40 Pac. 540]; *Pease* v. *Fink,* 3 Cal. App. 371, [85 Pac. 657].) In the instant case, not even a declaration or statement was made to the plaintiff by said alleged agents, or by anyone in their behalf, that they were acting as agents for anybody. Nor is there evidence of any "holding out," such as sometimes is the case when a principal intentionally, or by want of ordinary care, causes a third person to believe another to be an agent of such principal who in fact is not employed by him—the plaintiff testifying, as we have already seen, that he knew no one in the deal but Hayward, Rath & Marshall. There is nothing in the record, to which our attention has been called, aside from the declarations of the alleged agents themselves—and these were all made after the agreement in question was entered into—which proves the existence of the relation of principal and agent in this case; and even if competent, the declarations referred to fall short of that attainment. [4] Under these circumstances, the absence of such relationship must be held to be an established fact.

It would seem obvious that unless the record discloses evidence competent to show that Mr. Newmark was an official or agent of the defendant corporation, clothed with authority to bind the latter by any statement made by him to third persons upon which reliance has been placed to their detriment, that the judgment must be reversed. In our effort to discover such evidence, we have searched the record furnished us, with the result that the following is the only testimony to be found which in any way tends to identify Mr. Newmark. While the witness Hayward was on the stand he was asked the question: "Who is Mr. Newmark?" to which he replied: "That gentleman there"—indicating Mr. Newmark; and upon being further asked,

"Who were the orders for, Mr. Newmark himself or the Newmark Grain Company, or some other person?" this same witness answered: "I suppose it was for the Newmark Grain Company." Clearly, the latter question called for and the answer was but the conclusion of the witness, with no supporting evidence—manifestly incompetent.

The evidence being insufficient to support the finding of agency, the judgment cannot stand. It is therefore needless to discuss any other point urged.

The judgment is reversed as to the defendant Newmark Grain Company.

FINLAYSON, P. J., Concurring.—I concur in the judgment. Plaintiff who is seeking to hold the Newmark Grain Company liable as an undisclosed principal, is not entitled to a judgment against that defendant and the other defendants also. **[5]** When one party to a contract deals with another as principal and afterward discovers that such party was in fact agent for an undisclosed principal, he may elect to hold either the agent, or, upon discovery, the principal; but he cannot hold both. The agent is liable because credit was originally extended to him in the belief that he was acting for himself. The undisclosed principal is liable on the theory that, having received the benefit of the contract made by his agent, he should assume its burdens. There is but one contract upon which the plaintiff in such an action can bring suit. The person with whom such plaintiff has directly contracted, the agent of the undisclosed principal, may be held liable on the contract as the real obligor, for he contracted in that capacity. Or, if the plaintiff in such an action so choose, he may treat the contract as the obligation of the undisclosed principal for whose benefit it was made, notwithstanding that, on the face of the contract, his agent appears to be the true obligor. There is, as we have said, but one contract in such cases. And though the plaintiff may elect to hold either one of two persons liable on that contract, either the agent or his undisclosed principal, he cannot make two contracts out of the one contract by seeking to hold each of those two persons liable severally as an independent obligor. Nor can he hold them both liable as joint obligors on one contract. He contracted with

but one obligor, not two; and though he may elect to hold either one of the two liable as the obligor under the contract, he may not hold them both jointly liable, for to do so would be to give him two obligors where he contracted with, and for the liability of, but one. The result is that the liability of the agent and his undisclosed principal is an alternative rather than a joint or joint and several liability, and either may be so held, but not both. So we find that, according to the weight of authority, it becomes the duty of the creditor, after disclosure of the agency and the identity of the principal, to elect which of the two he will look to to carry out the agreement of the agent. (Note to *Murphy* v. *Hutchinson,* 21 L. R. A. (N. S.) 786.) It seems that if, as in the instant case, the alleged undisclosed principal denies the existence of the relation of principal and agent, the party seeking to recover on the contract may commence the action against both the alleged undisclosed principal and his agent, in order to ascertain the facts. But though the plaintiff may bring the action against both, the rule, as I understand it, is that the plaintiff in such an action cannot have judgment against both the undisclosed principal and his agent, but, before the close of the case, must elect whether he will take a judgment against one or the other. (See *Sessions* v. *Block,* 40 Mo. App. 569; *Pittsburg Plate Glass Co.* v. *Roquemore* (Tex. Civ. App.), 88 S. W. 449; *Weil* v. *Raymond,* 142 Mass. 206, [7 N. E. 860]; *Tuthill* v. *Wilson,* 90 N. Y. 423; *Mattlage* v. *Poole,* 15 Hun (N. Y.), 556.)

The plaintiff, as perhaps it had the right to do, brought the action against the agent and the alleged undisclosed principal. The lower court, instead of requiring plaintiff to make an election at the close of the case to take judgment against the agent or against the alleged undisclosed principal, the Newmark Grain Company, entered judgment against both. This, I think, is ground for reversal.

WELLER, J., Concurring.—I concur in the judgment and in the opinion of the presiding justice.