JOHN D. HOSPELHORN, Receiver, *v.* PHILIP L. POE

[No. 21, January Term, 1938.]

*Decided April 21st, 1938.*

The cause was argued before BOND, C. J., OFFUTT, PARKE, SLOAN, MITCHELL, SHEHAN, and JOHNSON, JJ.

*J. Purdon Wright* and *Arthur W. Machen,* with whom was *Alexander Armstrong* on the brief, for the appellant.

*G. William Peppler* and *Ralph Robinson,* for the appellees.

PARKE, J., delivered the opinion of the Court.

The action against Philip L. Poe, individually, and trading as Philip L. Poe & Co., and J. Emory Cockey, who was not summoned, proceeded to a judgment in favor of Philip L. Poe, after the court had held the declaration bad on demurrer. The appeal is by the receiver. The questions on this appeal and those on three other appeals now pending on the current docket are so similar that, in order to prevent repetition, the various questions will be discussed in this opinion, but appropriate judgments will be entered separately in every case. *Hospelhorn v. Boyce*, 174 Md. 275, 198 A. 597; *Hospelhorn v. Blankman*, 174 Md. 277, 198 A. 598; *Martin v. Hospelhorn*, 174 Md. 279, 198 A. 599.

Pursuant to section 9 of article 11 of the Code of Public General Laws of Maryland, as amended by Acts 1933, ch. 529, sec. 1, the Bank Commissioner of the State of Maryland duly took possession on January 5th, 1935, of the property, assets, and business of the Baltimore Trust Company, a banking and trust company which was duly incorporated under the laws of the State of Maryland. On the same day a suit was begun in the name of the State of Maryland against the trust company for the purpose of having a court of equity assume jurisdiction of the property and business of the institution and direct and supervise its liquidation. In proper course, jurisdiction was taken and a receiver appointed with power and authority to take charge and possession of the books, papers, property, and effects of every kind, and to collect the outstanding debts due. The receiver proceeded in the discharge of these duties. On November 13th, 1935, the chancellor passed an order empowering the receiver to convert all the assets of the trust company, and, specifically, to collect, under the direction of the court, all the statutory liability of its stockholders, and to make distribution of the funds received among its creditors.

Later, on November 13th, 1935, the chancellor, who acted in accordance with the provisions of section 72 of article 11 of the Code, passed a decree whereby it was

adjudged that an assessment of the full par value of ten dollars a share on all the capital stock of the trust company was necessary to meet the statutory liability of the company to its creditors, and that such an assessment was levied and imposed, and the receiver was authorized and directed to demand and collect from the stockholders severally the said sum of ten dollars for every share of stock held by them, and, if not so paid, to take and institute such proceedings and suits against any and all parties liable.

Before all these times and things, the Bank Commissioner of the State of Maryland had, on March 4th, 1933, pursuant to the provisions of chapter 46 of the Acts of the General Assembly of Maryland, passed in 1933, which is known as the Emergency Banking Law, taken custody, control, and management of the Baltimore Trust Company, and, until the appointment of the receiver, had retained his office, duties, and powers as Commissioner in respect of said trust company for the period of one year from the passage of said statute, and a part of the second additional year under an extension made with the approval of the Governor and the Attorney General.

Against this common background of admitted facts, the several appeals present these particular allegations, which are required by the pleadings to be taken as true.

1. With respect to the first appeal on the docket, it is charged that on March 4th, 1933, Philip L. Poe, trading as Philip L. Poe & Co., was the owner and registered holder of 100 shares of the capital stock of the trust company, which was part of a block of 115 shares, for which two certificates of stock had been issued, and that the said defendant as such trader continued to hold these shares until January 15th, 1934, when said 100 shares were transferred of record from the said trader to the said J. Emory Cockey, who has ever since continued to hold said shares of stock.

The defendant, individually, and as he traded, pleaded the general issue pleas and later, on demand, furnished a bill of particulars of his defense. In this bill of particu-

lars it is set forth that before November 13th, 1935, when the trust company was decreed to be insolvent, the defendant had sold, in good faith, the 100 shares of stock mentioned in the pleadings to Edward D. Allen & Co., members of the Baltimore Stock Exchange, and that on this date the shares of stock were owned by J. Emory Cockey, and were so registered on the books of the trust company, and that the defendant was neither the shareholder of record nor the transferee. The plaintiff then demurred to the pleas, which, mounting to the first error in pleading, caused the court to consider the legal sufficiency of the declaration and, as a result, to hold the declaration bad.

2. In regard to the second appeal on the docket, which concerns an action against the banking and brokerage house of Stein Bros. & Boyce, it is averred in the first count of the declaration that a copartnership, trading as stock brokers and investment bankers, under the firm name of Stein Bros. & Boyce, had a certain clerk in its employ who acted as agent for the said copartnership as its undisclosed principal, and, in all things so done, under its direction and control, and an implied contract or obligation by said principal to hold said agent harmless against any liabilities incurred by him in the course of his employment. In the course of his employment and for the benefit of his principal, and without any knowledge on his part of the beneficial ownership thereof other than that of his principal, the agent had registered on March 4th, 1933, 665 shares of the capital stock of the said trust company in the name of the agent, and on the 15th of March, 1933, these shares of stock were transferred of record from registration in the name of the said agent to the Wortendyke Corporation, a foreign corporation which was not engaged in business in the State of Maryland, and had its offices in the City of New York, and which is now in course of liquidation. The defendants demurred to this count of the declaration. The demurrer was sustained and judgment was rendered, and appeal taken by the plaintiff.

3. In reference to the third appeal on this docket, which is from a judgment on a receiver's action against Wilmer P. Smith and Meyer Blankman, the declaration alleges that on September 11th, 1931, 200 shares of the capital stock of the Baltimore Trust Company were bought for the account of Meyer Blankman by the brokerage firm of J. Harmanus Fisher & Sons and the shares of said stock were registered in the name of one Wilmer P. Smith, an employee of the brokerage firm, and, upon the receipt of said shares of stock by the brokerage firm, they were placed in the possession of the said Blankman, and were intended and did become the property of the said Blankman, and that, on the 4th day of March, 1933, and ever thereafter, the said shares of stock so remained registered in the name of the said Smith with the ownership as aforesaid, and the possession of the said certificates of stock so issued in the name of Smith, assigned in blank by him, and held by the said Blankman. The defendant Blankman demurred to the declaration. The demurrer was sustained, and judgment entered in favor of the defendant, and the receiver has appealed.

4. The fourth appeal on this docket is from a judgment in an action by the receiver against Glenn L. Martin. The plaintiff alleges that on March 27th, 1933, the defendant was the holder and owner of 965 shares of the capital stock of the trust company and has continued to hold and own the shares until the bringing of the action. The defendant pleaded the general issue pleas. The third plea was "for partial defense on equitable grounds" and the fourth plea was a "special plea for partial defense." The plaintiff demanded the particulars of the defendant's defense under the first and second pleas. The bill of particulars disclosed that the defense under the general issue pleas was that, on March 4th, 1933, the Bank Commissioner of Maryland assumed the custody, control, and management of the Baltimore Trust Company, and that this status continued until the appointment of the receiver for the company on January 5th, 1935; and that at the beginning and throughout this period the trust

company was insolvent; and that the commissioner only received deposits and made collections upon the basis that such deposits and collections were held in cash, subject to demand withdrawal by such depositors, but otherwise did no general banking business. It is further stated that, as of January 5th, 1935, the Baltimore Trust Company had no debts or liabilities other than those incurred before March 4th, 1933, except the subsequent deposits and collections for which cash was held in trust. Under these circumstances, it was asserted, any stockholder who became such after March 4th, 1933, was not subject to an assessment on his capital stock; and since the defendant had not acquired his stock until March 29th, 1933, his stock so obtained was not subject to an assessment.

The bill of particulars was followed by a motion on the part of the plaintiff for a judgment by default, pursuant to section 312 of the Baltimore City Charter (1927), on the ground that the pleadings, when read in connection with the bill of particulars, did not set up a good defense, as required by the provisions of chapter 184 of the Acts of 1886, Rule Day Act of Baltimore City, but were an admission of an indebtedness of $6,750 on the assessment on 675 shares of stock; and a pre-purchase payment of fifty *per centum* on the assessment of $2,900 on the remaining 290 shares of stock.

The payment of five dollars on every one of 290 shares was made under an order of the court having jurisdiction of the receivership and of the liquidation of the affairs of the Baltimore Trust Company. The record discloses that an offer of $756,400 on behalf of the owners of 151,250 shares of the capital stock in final settlement of the liability of the owners as stockholders was made to the receiver and submitted to the court for its action. The chancellor passed an order, on December 11th, 1935, directing and authorizing the acceptance of the offer, unless cause to the contrary be shown by a designated day, with leave to all other stockholders to settle their respective assessments on the same basis if done by the same day, but thereafter the receiver should col-

lect the full liability of the stockholders in accordance with the order of court dated November 13th, 1935. The limit within which the stockholders could avail themselves of this opportunity was subsequently extended to January 13th, 1936.

The order became final and the predecessors in title of the defendant had apparently availed themselves of its provisions to the extent of 290 shares of the defendant's block of stock, but the defendant was not financially able to do so with respect to his remaining 675 shares. His plea by way of defense in part on equitable grounds sets up these facts, and advances as a bar to recovery on the ground that it is "inequitable, unjust and unconscionable" to enforce full liability against him who, he avers, was financially unable fully to take advantage of the terms of settlement during the limited period provided, and to allow those who were more fortunately circumstanced financially to be discharged of their liability by the payment of one-half of the assessment laid. The pleader, therefore, concludes that the receiver may not recover of him more than five dollars a share on his remaining 675 shares of stock.

It is not perceived how the financial position of the defendant could avoid the liability on his part to pay the assessment on capital stock. Nor does an equity arise through the financial inability of a stockholder to take advantage of a reduction in the amount of the assessment already imposed upon shares of stock when the offer of the reduction is made by the court, after the assured acceptance of a large proportion of the owners of stock, and the offer is open to all stockholders alike, and is conditioned on payment without litigation, in cash, and within a brief and specified time. The offer made was universal, so the defendant was accorded an equal opportunity with all others of his class. Hence, no unfair discrimination resulted. The requisites imposed by the court applied equally to all stockholders as a class, and whatever the disability under which the defendant labored was particular to himself and did not originate

with the plan adopted by the chancellor. *Hambleton & Co. v. Glenn,* 72 Md. 331, 340-343, 20 A. 115.

The remaining problems on these four appeals present four questions. With the facts that on November 13th, 1935, a decree of court was passed adjudicating the insolvency of the Baltimore Trust Company, a corporate banking institution of the State of Maryland, and declaring an assessment of the full par value of every share of stock be made and be paid by the stockholders liable therefor as a premise, the inquiries may be stated in these forms:

First. Is P, who, at the time of the Emergency Banking Act took effect on March 4th, 1933, was the owner of shares of the capital stock of the company, and on the 15th day of January, 1934, had caused these shares of stock to be transferred in good faith to C, in whose name the shares of stock have ever since continued to be registered on the books of the company, jointly and severally liable with C, as transferor and transferee, to the extent of the par value of every share of the stock so held?

Secondly. If, at the time the Emergency Banking Act took effect, A was the agent of S. B. & B., brokers and bankers, who had engaged to indemnify the agent against any liabilities which he might incur in the course of his agency; and if, on that day, A, in pursuance of such agency, had shares of the capital stock of the trust company issued and registered in the name of said agent as owner, but for the undisclosed use and benefit of his principals, and subject exclusively to their orders, by which the said agent, on March 15th, 1933, transferred of record said shares of stock and the certificate thereof to the Wortendyke Corporation, are S. B. & B., as the undisclosed principals of their agent, A, and the transferee corporation, jointly and severally liable for the assessment of the stock so held?

Thirdly. Are the registered holder of the legal title to shares of the capital stock and the unregistered beneficial owner thereof on March 4th, 1933, and continuously

thereafter until the assessment was made, jointly and severally liable for the assessment on such stock?

Fourthly. If shares of the capital stock of an insolvent bank, whose affairs, after March 4th, 1933, were in the custody, control, and management of the Bank Commissioner under the provisions of the Emergency Banking Act, were acquired and registered in the name of their owner after March 4th, 1933, and so remained until and after the time of the assessment of the capital stock of said bank, is the owner of such shares liable for the assessment of such stock?

I. The law governing the answers to the problems stated must be examined and applied. Before its amendment (Acts 1936, 1st Ex. Sess., ch. 151), the Constitution of Maryland provided that the General Assembly should grant no charter for banking purposes, nor renew any banking corporation in existence, except upon the condition that the stockholders should be liable to the amount of their respective share or shares of stock in such banking institution for all its debts and liabilities upon note, bill, or otherwise. Constitution, art. 3, sec. 39. The statutory provision with regard to the stockholders of every bank and trust company was that the stockholders should be "held individually responsible, equally and ratably, and not one for another for all contracts, debts and engagements of every such corporation, to the extent of the amount of their stock therein, at the par value thereof, in addition to the amount invested in such stock; * * * and the liability of such stockholders shall be an asset of the corporation for the benefit ratably of all the depositors and creditors of any such corporation, if necessary to pay the debts of such corporation, and shall be enforceable only by appropriate proceedings by a receiver, assignee or trustee of such corporation acting under the orders of a court of competent jurisdiction." Code, art. 11, sec. 72.

The effect of these constitutional and statutory provisions was to incorporate in the contractual relation between the incorporated banking institution and its stock-

holders, as one of its constituent terms, the obligation of the stockholders to pay, for the benefit of corporate creditors and claimants, an amount not in excess of the par value of the stock of the shareholders. *Allender v. Ghingher*, 170 Md. 156, 183 A. 610; *Ghingher v. Bachtell*, 169 Md. 678, 182 A. 558; *Coulbourn Bros. v. Boulton*, 100 Md. 350, 59 A. 711; *Norris v. Wrenschall*, 34 Md. 492. The statutory obligation stated bound the actual stockholder. Should the registration on the books be in the name of the stockholder as an executor, administrator, guardian, trustee, or pledgee, he is not bound personally because he is acting in a representative capacity, and his pledgor or the estate to which he bears the representative capacity is responsible. The statute explicitly enacts so much, and thus affords evidence that the registered holder of the stock is the party contemplated. Section 72 of article 11. Should the party be a pledgee, executor, administrator, guardian, or trustee, and have the shares of stock held in such capacity entered on the books of the corporation in his own name, then he, as between himself and the corporation, would, by his election, be bound individually to pay, and his remedy would be to look to his pledgor or the estate in his hands for indemnity, if permitted by his acts within the principles of subrogation. The statute makes no explicit declaration in regard to the relation of principal and agent. Nevertheless, upon principle and authority, a person who voluntarily permits his name to appear on the books of a corporation as a stockholder becomes liable as a stockholder, although he may actually hold the stock simply as agent, and may really have no beneficial interest whatsoever. By his acquisition of the stock, and his acceptance of the delivery of the share of stock as his document of title, after the record of its issue to him is entered on the books of the corporation, the person becomes. bound in accordance with this written evidence of his relation, so that later he may not disavow his obligations as the owner of the stock. *Fletcher on Corporations* (Perm. Ed.) secs. 6331, 6362, 6360, 6365; *Matthews*

*v. Albert,* 24 Md. 527; *Magruder v. Colston,* 44 Md. 349; *McKim v. Glenn,* 66 Md. 479, 8 A. 130; *Kerr v. Urie,* 86 Md. 72, 37 A. 789; *York County Bank v. Stein,* 24 Md. 447. The duty is on the agent, if he would avoid personal liability, to disclose his agency, and not upon others to discover it. *Mechem on Agency* (2nd Ed.) secs. 1410, 1411, 1413.

II. However, the corporation may, on discovery of the agency, hold liable either the agent or his principal, as the real owner of the stock. The identity of the principal may be established by parol testimony, because the evidence is not in conflict with the contract nor in discharge of the agent, but simply establishes the additional liability of the undisclosed principal as a party to the contract (a). The liability of the agent, in those instances in which he promises in his own name, although really for an undisclosed principal, is based upon the fact that the treaty between the contracting parties is made upon the single credit and faith of the agent, because of his choosing not to reveal his principal. In such circumstances, the other contracting party has the right to hold the agent individually bound or to elect between the agent and the principal, when the latter is disclosed (b). The promisee, upon discovery of the principal, may enforce the contract against either at his election, and it is held that he may simultaneously bring an action separately against the principal and the agent, but the promisee may have but one satisfaction (c). It is urged that the contractual relation of principal and agent does not admit of a joinder of the principal and agent in an action at law, since the promise is not joint nor several, but rather alternative. The obvious reply is that the fundamental things concerned are single. There is but one contract to be performed in respect of the one subject matter involved, and the principal and agent constitute but one party of the contract. (a) *Mechem on Agency* (2nd Ed) sec. 1733. See *Rider v. Morrison,* 54 Md. 429, 443-445; *Bloede v. Bloede,* 84 Md. 129, 139-141, 34 A. 1127; *Kerr v. Urie,* 86 Md. 72, 37 A. 789; (b) 3 *C. J. S., Agency,* sec.

248, pp. 175, 176; (c) 3 *C. J. S., Agency,* sec. 248; pp. 177, 178; *Estes v. Aaron,* 227 Mass. 96, 116 N. E. 392; *Gavin v. Durden Coleman Lumber Co.,* 229 Mass. 576, 118 N. E. 897.

In the words of Mechem: "Whether the agent and the principal may be joined as defendants in the same action is a question involving a variety of considerations and leading to much difference of opinion. * * * It will suffice here to say that there is a large and constantly growing number of cases in which it is held that such a joinder is proper." The learned author cites a number of cases in support of the quoted text. 1 *Mechem on Agency,* sec. 1487, n. 59, pp. 1103, 1104. In the course of a subsequent discussion of what will constitute an election by the third party after discovery of the principal has been made, the author observes that "the mere commencement of an action against an agent, although this act is often regarded as an election in other fields, is not here deemed to constitute a conclusive election as a matter of law, whatever may be its force as evidence of an election as a matter of fact. There is, moreover, as has been seen, authority for saying that principal and agent may be simultaneously sued severally, and possibly even jointly." Section 1758, pp. 1336, 1337, 1759; *Curtis v. Williamson,* [1874] L. R. 10 Q. B., 57; *Priestly v. Firnie,* 1865, 3 H. & C., 977.

In *Williston's Wald's Pollock on Contracts* it is flatly stated: "When it is said that he (the other party) has a right of election this means that he may sue either the principal or the agent or may commence proceedings against both, but may only sue one of them to judgment; and a judgment obtained against one, though unsatisfied, is a bar to an action against the other." p. 116. See *Pollock on Contracts* (7th Ed.), p. 105.

The rule in Maryland is similarly stated in *Codd Company v. Parker,* 97 Md. 319, at page 325, 55 A. 623, 624: "And the general principle appears to be established that where an agent contracts in his own name, without disclosing his interest, though in fact for the exclusive bene-

fit of another person, who is afterwards discovered, the creditor may sue either, but after he has elected whom to sue, and has sued either the agent or principal to final judgment, he cannot after that sue the other, whether the first suit has been successful or not."

Since the third party may simultaneously sue separately the agent and his undisclosed principal, after the latter's discovery, and is not held to have made an election to look to the one or the other, until he takes a final judgment against the one he thus elects to hold to the exclusion of the other, there is no sound reason why the agent and principal may not be sued jointly by the third party, in an action to recover the stockholder's liability on shares of stock held by the agent for a principal who was not known to the third party at the time the stock was registered, and the certificate issued, in the name of the agent. The plaintiff in the joint action may therein elect, with equal, if not greater, facility, and with more certainty and singleness of procedure and record, against which of the joined defendants he would take his final judgment. Since the obligation is of statutory origin, and, so, is not a right created by a consensual contract but falls into the class of *quasi* contracts, there is no difficulty in the joinder of the principal and agent at the suit of a third party to enforce the statutory obligation, because it is not necessary to find an express or implied contract entered into by the two defendants jointly promising the plaintiff to pay or to do, but merely a statutory obligation to pay an amount which the two defendants are alternatively bound to pay the plaintiff, who may be required to elect, before the final judgment, whether the judgment is to be taken against the principal or the agent. *History of Assumpsit, Ames,* Selected Readings on Law of Contracts, p. 56; *Woodward on Quasi Contracts,* sec. 1; *Keener on Quasi Contracts,* p. 16; *Broderick v. Aaron,* 151 Misc. 516, 272 N. Y. Supp. 219, 236, 237, affirmed 243 App. Div. 594, 277 N. Y. Supp. 499, affirmed in 268 N. Y. 411, 198 N. E. 11; *Id.,* 268 N. Y. 665, 198 N. E. 547, without a discussion of the question

of election as decided in 272 N. Y. Supp. 219, 236, 237. If the parties had agreed in terms to these relative obligations arising out of the statute and their relations as principal and agent, the contract would have been valid and its breach of performance give rise to a good cause of action *ex contractu* against the joined defendants. See *Addison on Contracts*, sec. 319; *Parsons on Contracts*, *657; *Williston on Contracts* (Rev. Ed.) sec 328, p. 954.

In the making of the contract by the agent for his undisclosed principal, the agent had the right of exoneration against the principal to the extent of the liability assumed by the agent in the purchase of the shares of stock pursuant to the terms of the agency. This right was an asset of the agent. So, the payment by the agent of whatever might be assessed against him as the purporting owner of the shares of stock, constituted a claim of the agent for which he could maintain, if not paid, an action against the principal. Hence the demand or action which was recoverable of the agent on his liability as stockholder would, in turn, involve the reimbursement of the agent by the principal; and this circuitous and ultimate discharge of what was the principal's primary obligation illustrates the substantial nature of the rights and liabilities which the principal and agent had in the statutory action brought to recover the assessment laid on the purporting owner of the shares of stock by a court, and collectible on the order of that court by its receiver or other officer for the benefit of the creditors of the banking institution in course of liquidation. Code, art. 11, sec. 72. Thus the plaintiff's joinder of the principal with the agent is justified in principle as a means of satisfying the agent's liability for the assessment on the shares of stock by enforcing against his principal the right of the agent to be indemnified or exonerated by the principal for all liability on account of the discharge of the agency with reference to the shares of stock. *Williston on Contracts* (Rev. Ed.) sec. 289. The fact that the parties have not put their relationship in writing suggests a practical basis in support of a joinder. The other

party's ignorance of the principal's existence is due to the nondisclosure of the principal and of his agent, and, so, its consequences are chargeable to both. If the third party contract with an agent for an undisclosed principal, he may hold the agent or, upon discovery, the principal, but the third party cannot recover from both. If the third party elects to hold the agent, the principal is discharged; and, conversely, if he elects to hold the principal, the liability of the agent is at an end. The existence of the relation of principal and agent is a fact, and the agency may be asserted and denied by the immediate parties. Under such circumstances, full knowledge of the facts which are material to the third party's election is difficult of ascertainment, and, unless the principal and agent are joined in the action, the third party would be required to make an election before it was certain that he had two alternative remedies in reference to which an election was necessary. The following cases may be cited as affording illustrations of this point: *Gay v. Kelley,* 109 Minn, 101, 123 N. W. 295; *Stevens v. Wisconsin Farm Land Co.,* 124 Minn. 421, 145 N. W. 173; *Estes v. Aaron,* 227 Mass. 96, 116 N. E. 392; *Marsch v. Southern etc. Corp.,* 230 Mass. 483, 120 N. E. 120, 125, 126; *Craig v. Buckley,* 218 Cal. 78, 21 P. 2d 430; *Ewing v. Hayward,* 50 Cal. App. 708, 195 P. 970; *Klinger v. Modesto Fruit Co.,* 107 Cal. App. 97, 290 P. 127; *North Carolina Lumber Co. v. Spear Motor Co.,* 192 N. C. 377, 135 S. E. 115; *Dornfeld v. Thompson,* 177 Wis. 4, 187 N. W. 683; *Mussenden v. Raiffe,* 131 Ill. App. 456; *Limousine etc. Co. v. Shadburne,* 185 Ill. App. 403. *Contra: Old Ben Coal Co. v. Universal Coal Co.,* 248 Mich. 486, 227 N. W. 794.

If, before the passage of chapter 46 of the Acts of 1933, an agent should become the holder in his own name of shares of stock of a banking institution for an undisclosed principal, and the owner of such stock become bound to pay a stock assessment thereon, and the principal of the agent be discovered, it therefore follows on principle, and by the weight of authority, that it is permissible for the plaintiff to join the agent and the prin-

cipal in an action to recover for the assessment made according to the statute on the stock held in the name of the agent, and that in the action the plaintiff may elect, before final judgment, whether the agent or the principal is to be held responsible. *McDevitt v. Corriea & Bros.*, 70 Cal. App. 245, 233 P. 381; *Klinger v. Modesto Fruit Co.*, 107 Cal. App. 97, 290 P. 127; *Fleming v. Dolfin*, 214 Cal. 269, 4 P. (2nd) 776; *Craig v. Buckley*, 218 Cal. 78, 21 P. (2nd) 430; *Gay v. Kelley*, 109 Minn. 101 123 N. W. 295; *Stevens v. Wisconsin etc. Co.*, 124 Minn. 421, 145 N. W. 173; *Williams v. O'Dwyer etc. Co.*, 127 Ark. 530, 192 S. W. 899; *Gavin v. Durden Coleman Lumber Co.*, 229 Mass. 576, 118 N. E. 897; *Veazie v. Beach Plumbing & Heating Co.*, Tex. Civ. App., 235 S. W. 695; *Dornfeld v. Thompson*, 177 Wis. 4, 187 N. W. 683; *The Jungshoved* (C. C. A.) 290 Fed. 733, *certiorari* denied 263 U. S. 707, 44 S. Ct. 35, 68 L. Ed. 517; *Ballantine on Corporations*, sec. 222 pp. 707-708; *Fletcher on Corporations* (Perm. Ed.) sec. 4191. See *Rider v. Morrison*, 54 Md. 429, 444; *Richmond v. Irons*, 121 U. S. 27, 7 S. Ct. 788, 30 L. Ed. 864; *Early v. Richardson*, 280 U. S. 496, 50 S. Ct. 176, 74 L. Ed. 575; *Pauly v. State etc. Co.* 165 U. S. 606, 17 S. Ct. 465, 41 L. Ed. 844; *Ohio Valley Nat. Bank v. Hulitt*, 204 U. S. 162, 27 S. Ct. 179, 51 L. Ed. 423; *Stuart v. Hayden*, 169 U. S. 1, 18 S. Ct. 274, 42 L. Ed. 639.

III. The relative rights and liabilities of the banking institution, its creditors and stockholders, thus remained until the passage of the Act of 1933, ch. 46, terminated one period, and by differently regulating the effect of subsequent transfers of shares of stocks and by assuming control and management of corporate affairs, began a new period. Before this statute a stockholder could transfer in good faith and to a responsible person his shares of stock in order to be relieved of his statutory stock liability. *Magruder v. Colston*, 44 Md. 349. In respect to the effect of a subsequent transfer of stock, the act last mentioned made important modifications which will require statement and consideration. The statute

was an emergency measure of a period in which grave financial distress and disorder prevailed. It was passed of necessity, and by its own terms proclaimed that the welfare of the State as a whole and of the depositors and creditors of banking institutions required the immediate enactment of additional legislation to promote justice, prevent distress and discriminations, and to establish an orderly method of reconstruction. In addition to all the other powers of the Bank Commissioner, the statute required that on March 4th, 1933, the day the law became effective, the Commissioner should forthwith take custody, control, and management of every banking institution of the State, and, until the Commissioner should proceed to exercise his powers to wind up a banking institution under the provisions of section 9 of article 11 of the Public General Laws of the state, as amended, entitled "Banks and Trust Companies," the business of all of said banking institutions in such custody should be continued by the Commissioner, under the terms of the act, in regular course. In addition to the withdrawal of a particular banking institution from the operation of the statute when its affairs were wound up pursuant to the provision of section 9, as amended, any banking institution might exempt itself from the custody, control, and management of the Commissioner, and all other provisions of the statute, if the Commissioner should deem such exemption to be in the public interest, and the Governor and Attorney General should give their written approval, subject to the resumption of the banking institution's former status under the statute whenever found to be in the public's interest. The custody, control, and management of all banking institutions, except as noted, was prescribed for the period of one year from the passage of the law, and for an additional period of one year, in the discretion of the Bank Commissioner, with the approval of the Governor and the Attorney General. The period was extended to embrace this second year, so the general custody, control, and management endured until March 4th, 1935.

It is important to know that during the entire period "all of the remedies at law or in equity of any depositor, creditor, stockholder or other person in interest, arising out of agreements or transactions made prior to the passage of this Act, against any banking institution in the custody of the Bank Commissioner as provided by this Act, shall be suspended, and the statute of limitations against any such claims shall be suspended. * * * Provided, however, that nothing herein contained shall be construed to prevent any depositor or creditor of a banking institution from exercising his rights against any collateral security he may hold for his claim, or to prevent such institution from redeeming such collateral security, or to impair or postpone any right of set-off, but no debtor shall have the right to set-off any credit extended or deposit made before the passage of this Act against any obligations arising after the passage of this Act, and no deposit in or claim against any banking institution at the time of the passage of this Act shall be assigned to any debtor of such institution so as to create a right of set-off against his indebtedness thereto." Acts 1933, ch. 46, sec. 71B.

During the period of two years the assets and business of the institution shall be deemed to be in the possession of the Commissioner *in custodia legis*, and the property of the institution was not to be subject to attachment, execution, distraint, or seizure under any judicial process of any kind. All rights to withdraw deposits from or assert claims against any banking institution under the management of the Commissioner were stayed for the entire period of two years.

The statute contained further provisions with respect to the reorganization of existing banking institutions, and to the creation of new ones to carry on or to segregate all or part of the business of existing banks. There were many other things authorized which need not be stated, but all were made subject to the terms of 71M of the Acts of 1933.

It will be observed, from these recited provisions of

the act, that its object was to stabilize the financial situation by the creation of a *moratorium* with reference to the banking institutions of the state. In order to effect this purpose the assets and the liabilities, and the relative and respective rights, duties, powers, and obligations of the depositors, creditors, and stockholders were withdrawn and held in abeyance for the duration of the *moratorium*, except as contemplated by the act; and the custody, control, and management were granted to the Bank Commissioner. The act dealt with exigent matters for a limited period. So, the rights, powers, and liabilities of the stockholders, except as necessarily affected by the incidence and operation of the statute, were to be preserved and maintained as of March 4th, 1933, when the act went into effect. Since the ownership of capital stock bound the owner for an equal amount of the nominal value of the stock for the benefit of the creditors of the corporation, and since a transfer of such stock on the books of the company, after the passage of the act, would not interfere with the custody, control, and management, and since the effect of the act was to appropriate all the assets of the banking institution, including the liability of its stockholders as of the date of its passage, to the purposes of the act, which included liquidation, if necessary, the class of stockholders which was prospectively liable for the payment of the par value of the stock of every banking institution within the scope of the act was composed of the owners of the stock on that date. It was, therefore, necessary for the statute to preserve this liability for the benefit of creditors and depositors in the event that it should be necessary to enforce the payment of this liability by virtue of an order of a court of competent jurisdiction. The owner of the shares of stock, on the other hand, had a right as owner to transfer whatever might be his interest in such shares. It is immaterial, so far as the rights of creditors and depositors are concerned, what might be the respective rights of the owner and his transferee, *inter sese,* provided the liability of the transferor re-

mained. The statute, therefore, declared that nothing contained in the act shall be construed to relieve any stockholder of record in any banking institution at the time of its passage from the liability imposed by section 72 of article 11. In this manner the act preserved the rights of the creditors and did not enlarge the obligations nor restrict materially the rights of the stockholder. The changes wrought were procedural and not substantive.

The operation of the bank had been suspended and the custody, control, and operation of its property and assets had been superseded. Whether it would ever resume its corporate affairs was uncertain. *Ghingher v. Pearson,* 165 Md. 273, 276, 277, 296, 297, 301, 302, 168 A. 105; *Nagel v. Ghingher,* 166 Md. 231, 238, 239, 171 A. 65. The probability of such a contingency necessarily was considered by the Legislature. Consequently, it was a reasonable measure to preserve the status *in quo,* as of the date the act became effective, for the benefit of creditors of an insolvent banking institution, and, incidentally, for the protection of the class of stockholders in securing, so far as was practicable, the same measure of contribution from every solvent one of the class of stockholders of that date by preventing all stockholders from assigning their shares except upon the requisite statutory precautionary conditions. Furthermore, the statute was a public general law, and, so, every one within the state was bound to know its existence and its terms. In addition, the statute declared that during the period of its effective operation the assets, operations and affairs of the institution were in the custody, control, and management of the Commissioner, and that this possession was *in custodia legis.* So, all corporeal and incorporeal objective things of the banking institution were held by the Commissioner as though by virtue of legal process, and this status of corporate assets and affairs could only be changed by the end of the authority of the Commissioner pursuant to the statutory provisions in that respect. Accordingly, any shareholder as of the

date the statute became effective could not later transfer on the corporate books stock of such banking institution then within the operation of the statute, without either actually knowing, or, by reason of these circumstances, being charged with the knowledge of, the conditions imposed upon such transfer by the statute. Consequently, if during this period of *in custodia legis,* a shareholder of stock, in the institution so held in possession, transfer stock so as to pass to a third party not affected by the previous proceedings nor by the later result of the statutory proceedings, the transferor and the transferee are on notice and are both charged with the conditions which the statute imposes on such a transfer. *McKim v. Glenn, Trustee,* 66 Md. 479, 483-486, 8 A. 130; *Brinkley v. Hambleton & Co.,* 67 Md. 169, 175, 8 A. 904; *Hambleton v. Glenn,* 72 Md. 331, 337-339, 20 A. 115; *Fidelity Mut. Life Assn. v. Ficklin,* 74 Md. 172, 180, 181, 21 A. 680, 23 A. 197; *Re National Bank,* [1897] L. R. 1 Ch. 298; *Mosler Safe Co. v. Guardian Trust Co.,* 208 N. Y. 524, 101 N. E. 786; *Sprague v. Nat. Bank of America,* 172 Ill. 149, 50 N. E. 19, 26; *Machen on Corporations,* secs. 766, 926; *May v. McQuillan,* 129 Mich. 392, 89 N. W. 45; *Graham v. Platt,* 28 Colo. 421, 65 P. 30; *Hill v. Graham,* 11 Colo. App. 536, 53 P. 1060; *Broderick v. Aaron,* 268 N. Y. 260, 197 N. E. 274, annotated in 103 A. L. R. 684-695.

The last cited case is not in conflict with the views herein expressed, as the statute there construed is different, and does not appear to have the provisions of the Act of 1933 permitting and defining the assignment of shares of stock during the custody of the bank commissioner.

IV. It was, therefore, within the legislative power of the General Assembly to declare that the act was not intended to impair the liability of the stockholders of record as of March 4th, 1933, and to provide that, should such owner later transfer his stock, he and the subsequent transferee of record of said stock, at the time the statutory liability for assessment shall become enforceable,

shall be jointly and severally liable to the receiver for the statutory assessment on these shares. In order to preserve the contractual or implied rights of the stockholder as of March 4th, 1933, and his transferee, and between subsequent transferees during the period of the operation of the statute, the statute preserves to them whatever rights there may be of indemnity and exoneration. Section 71M.

These provisions of section 71M of the act are operative and thus bind the owner of the stock, as of the date of the beginning of the custody under the act, and his transferee, and subsequent transferees; subject to the statutory provision that "the liability of such transferor shall terminate whenever the custody of the Bank Commissioner shall cease by reason of the exemption of the banking institution whose stock is so transferred from the provisions of this Act as hereinbefore provided in Section 71A, or upon the cessation of the Bank Commissioner's custody by the expiration of the time limited in said section, which ever shall first occur."

The first condition for the termination of the transferor's liability did not occur, because at no time did the bank commissioner deem it to be in the public interest, with the written approval of the Governor and Attorney General, to permit the trust company to exempt itself from the provisions of the act. Nor was the liability of the transferor terminated within the scope of the second statutory condition. The limitation was made applicable to the liability of a transferor of shares of stock in banking institutions during the period specified. The time limit was fixed by section 71A at a possible two years that would end on March 4th, 1935. For there to be a "cessation of the Bank Commissioner's custody by the expiration of the time limited in said section," it was necessary for the custody to exist on March 4th, 1935, because the cessation of custody by the arrival of a specified day presupposes as a precedent fact the duration of the existence of that custody until that day. So, the prescribed conditions for the termination of the transferor's statutory liability on this ground were not fulfilled.

The interpretation of these provisions of the statute that, at the end of two years, the statutory liability of the transferor expires, without reference to whether or not the custody of the banking institution is then in the Bank Commissioner under the statute, not only is in conflict with the language of the section, but also ignores a cardinal provision of the act. In the third paragraph of section 71A is a recognition that a banking institution within the scope of the emergency legislation may pass from the statutory custody of the Commissioner whenever the Commissioner should proceed to exercise his powers to wind up a banking institution pursuant to the terms of section 9 of article 11, as amended. And this provision is implemented by a distinct section of the act that:

"At any time during his custody of any banking institution as authorized by this Act, the Bank Commissioner may exercise the powers conferred upon him by Section 9 of this Article, and with the written consent of the Governor and Attorney General obtained prior thereto, forthwith proceed as Receiver, subject to the provisions of said section, and thereupon all suspension of remedies and extensions of deposits or debts shall cease and determine." Section 71F.

In *Ghingher v. Pearson,* 165 Md. 273, at page 301, 168 A. 105, 115, it was said:

"Chapter 46 of the Acts of 1933 was an emergency act growing out of a grave financial crisis, and, while it was designed primarily to provide a period of relief, rest, and recovery for financial institutions and then a complete and prompt resumption of business by those of adequate financial strength, and a controlled and part resumption of business by those of impaired and inadequate resources pending a reorganization which would restore the soundness of their financial structure, it was implicit in the legislation that an institution which could not reorganize must liquidate its affairs, and that situation is anticipated and covered by section 71F of the act."

The Commissioner duly proceeded under section 9, as

amended, on January 5th, 1935, and thereupon his statutory custody under chapter 46 of the Acts of 1933 ended. By force of the terms of section 9, as amended, all the property, assets, and business of the trust company were thereupon declared by the law to be in the Bank Commissioner as receiver, as though he had been appointed by an order of court. The possession of the receiver operated as a bar to any and all attachments, liens, executions, or distraints of any kind. In accordance with the command of section 9, as amended, the Commissioner instituted proceedings at once in the name of the State of Maryland against the trust company in the Circuit Court No. 2 of Baltimore City, for the purpose of having the court assume jurisdiction over its property and business for final liquidation.

By force of this statute all the assets of the trust company were transferred to the Bank Commissioner as receiver. The liability of the stockholders, under section 72 of article 11, and of the transferors and transferees of stock after March 4th, 1933, under section 71M of chapter 46 of the Acts of 1933, were assets of the trust company for the benefit ratably of all its depositors and creditors, if necessary to pay the debts of the corporation. If this were not the case, the provision of section 71M that nothing contained in this act shall be construed to relieve any stockholder of record in any banking institution at the time of the passage of this act from the liability imposed by section 72 of article 11 would not be effective as contemplated, because the transferor of stock, but none other, would be relieved of all liability at the end of one or two years from the day the act was passed, although by reason of unavoidable delay, through protracted litigation or otherwise, one or two years, as the case would be, had elapsed before the amount of the statutory liability had been determined and assessed and ordered paid by the court.

Another reason for the interpretation adopted is afforded by the language of section 71M. The sentence in point is, "Any person who may be a stockholder at

the commencement of said period of custody and the subsequent transferee of record of said stock at the time the statutory liability for assessment shall become enforceable, shall be jointly and severally liable to the receiver for the statutory assessment on said shares." Thus the liability to pay is not within one or two years, when the custody of the bank commissioner must end, but at the time, no matter how remote, the statutory assessment shall become enforceable. And the liability runs to the receiver of the banking institution. Since, during his official custody of the institution as defined by the act, the Commissioner has no power as such custodian to enforce the stockholder's statutory liability, and since his custody as Commissioner under the act ends as soon as he becomes a receiver of the institution, and since the enforcement of the liability against the shareholder or transferor and the transferee, as specified, depends upon the determination of the amount of the assessment by a court of competent jurisdiction in appropriate proceedings by such receiver, and the orders of that court authorizing the enforcement, it must be clear that, if there were proceedings begun under section 9 of article 11, as amended, within the period designated by section 71M, it was not intended to apply the limitation in time under such circumstances, even if the adjudication and imposition of the amount of the assessment and the order of the court were after the period named by chapter 46 of the Acts of 1933 had expired. Article 11, sec. 72.

Full effect is accorded the language of the statute of 1933 by this interpretation, and the rights and liabilities are equally protected and enforced. While the questions under consideration are not free of difficulty, the conclusion here reached is that, by the quoted and discussed provisions of section 71M, the Legislature meant that the liability of a transferor should terminate (a) whenever, during the period of custody permitted by the act, the Bank Commissioner became satisfied that the solvency of the institution entitled it to be released and exempted from the operation of the act, so that the relations of

the creditors and stockholders would be restored to their normal state under the law; or (b) when the continuance of the custody of the Bank Commissioner should end by the expiration of the statutory period as limited by section 71A, unless that custody should have been sooner ended by the Bank Commissioner, with the written consent of the Governor and Attorney General, proceeding under the powers conferred by section 9 of article 11 of the Code, as amended, for the liquidation of a banking institution.

Since the bank commissioner proceeded under section 9 for the liquidation of the trust company before the expiration of the period limited by the act, the liability of the shareholder or transferor and the transferees remain as assets of the trust company.

V. As a necessary consequence of chapter 46 of the Acts of 1933, the right of the shareholder to effect a novation of his statutory liability by a transfer of his shares, and the registration by the corporation of the transfer and the issue of a new certificate to the transferee as a shareholder, was suspended, and any transfer would operate as an assignment of the interest of the shareholder under the conditions prescribed by the statute. This result was a condition of ownership which had been imposed when the charter of the corporation was granted, subject to the provision that the personal liability then prescribed by statute should be subject thereafter to repeal or alteration. *Stockholders of Peoples Banking Co. v. Sterling*, 300 U. S. 175, 183, 185, 57 S. Ct. 386, 390, 81 L. Ed. 586; *Ghingher v. Bachtell*, 169 Md. 678, 182 A. 558; *Ghingher v. Kausler*, 169 Md. 696, 182 A. 566. The decisions cited are decisive that chapter 46 and section 71M thereof are constitutional; and effect must be given according to its terms as here interpreted.

VI. Several subsidiary questions remain. The first relates to when the statutory liability is enforceable. The liability for an assessment accrues when the stock is registered in the name of the holder and continues while the stock is so registered. The liability to pay the assess-

ment accrues due upon the determination of the amount to be paid by an order of court of competent jurisdiction; and, since section 71M of the Emergency Banking Act became effective on March 4th, 1933, the amount of the assessment thus made and accrued due is payable by, and enforceable (1) either against the holders of shares of stock of record on March 4th, 1933; or (2) jointly and severally against the holder of a share of stock on that date and the subsequent transferees of record of such stock at the time when the liability for assessment became enforceable. Section 71M. *Mister v. Thomas*, 122 Md. 445, 459, 89 A. 844; *Glenn v. Williams*, 60 Md. 93; *Robinson v. Hospelhorn*, 169 Md. 117, 133-136, 179 A. 515, 184 A. 903; *Ghingher v. Bachtell*, 169 Md. 678, 688-694, 182 A. 558.

The second inquiry is in regard to the effect of a failure to have transferred on the books of the corporation shares of stock which, before March 4th, 1933, had been transferred, in good faith, by delivery, to the transferee, of the certificate indorsed either in blank or to the specified transferee by the registered stockholder, who appeared by the certificate to be the owner of the shares represented thereby; or had been otherwise transferred in accordance with the terms of the Uniform Stock Transfer Act. Code, art. 23, secs. 51-73, as amended. The act declares that a transfer so made would give the transferee the legal title to the certificate and to the shares which it represented, without a transfer of record on the books of the corporation, but section 53 (b) makes the reservation that nothing in the act shall be construed as forbidding a corporation to hold liable for calls and assessments a person registered on its books as the owner of shares. So, the act does not affect the question at bar; and it must be so considered and decided.

The problem is not a new one. By force of the language of the statute, when read in reference to the object of the provision and its enforcement, it has been decided that the transferor in whose name the stock remains on the books of the corporation as its registered

owner continues liable for the assessment on the stock, and must pay. Whatever rights he may thereby acquire are for enforcement by way of exoneration or indemnity against his transferee. *Magruder v. Colston,* 44 Md. 349; *Huztler v. Lord,* 64 Md. 534, 3 A. 891; *Brinkley v. Hambleton & Co.,* 67 Md. 169, 178, 8 A. 904; *Kerr v. Urie,* 86 Md. 72, 78, 79, 37 A. 789; *Richmond v. Irons,* 121 U. S. 27, 58, 7 S. Ct. 788, 30 L. Ed. 864.

In *Cook on Corporations* (6th Ed.) it is said: "The law is well settled that the transferrer of stock is liable to corporate creditors on his statutory liability, up to the time of a registry of the transfer, to the same extent that he would be if no sale and transfer of the certificate had been made until the date of the registry. Until registry is made, creditors may hold the transferrer liable, as though he had not sold his stock." Section 260. The rule applies to those instances in which the transfer was made before March 4th, 1933, as, since that date, all transfers within the scope of chapter 46 of the Acts of 1933, are governed by its terms. *Supra: McKim v. Glenn,* 66 Md. 479, 8 A. 130; *Golden v. Cervenka,* 278 Ill. 409, 116 N. E. 273; *Kirschler v. Wainwright,* 255 Pa. 525, 100 A. 484; *Broderick v. Aaron,* 268 N. Y. 411, 198 N. E. 11. See *Young v. Floria,* 65 App. D. C. 141, 81 Fed. (2nd) 275, 104 A. L. R. 634-649.

The court at *nisi prius* rejected all the grounds urged in support of the demurrer, except the one that is based on the theory that section 71M was inapplicable to the defendant and transferor, Philip L. Poe, trading as Philip L. Poe & Co., because section 71M became ineffective by the expiration of the two years' period of its operation on March 4th, 1935, and there had been no judicial ascertainment of insolvency, nor assessment made and order given for the enforcement of the stockholder's statutory liability, until November 13th, 1935. The court here has stated the reasons for its conclusion that section 71M is not only constitutional but that it imposes an enforceable liability on the defendant who pleaded to the

action. Finding no error, the demurrer should have been overruled, and further proceedings had.

*Judgment reversed, with costs to the appellant, and case remanded for further proceedings.*