GARFINKEL *v.* SCHWARTZMAN, ET AL.
* * *
SCHWARTZMAN *v.* GARFINKEL

[No. 249, September Term, 1968.]

*Decided June 2, 1969.*

The cause was argued before HAMMOND, C. J., and BARNES, FINAN, SINGLEY and SMITH, JJ.

*Mark P. Friedlander,* with whom were *William M. Canby* and *Miller, Miller & Canby* on the brief for David Garfinkel.

*Irving B. Yochelson* and *Edward H. Kerman,* with whom were *Grossberg, Yochelson, Brill & Fox* on the brief, for Marcus S. and Aaron S. Schwartzman.

SMITH, J., delivered the opinion of the Court.

We have here two appeals. David Garfinkel (Garfinkel) appears here as appellant in one appeal and as appellee in the other. He is a real estate broker. In 1964 he and Harold Sampson, another broker, obtained a listing of property in Montgomery County owned in part by Aaron Schwartzman (Aaron), who appears here as appellee in the Garfinkel appeal, and in part by his brother, Marcus Schwartzman (Marcus), who appears as appellee in the Garfinkel appeal and is also an appellant. The contract was an exclusive listing agreement dated June 2, 1964, and expiring December 2, 1964. It was signed on behalf of the seller by Aaron and *not* by Marcus. The property is described as:

"Approximately two hundred acres of ground in Mont-

gomery County, Md. situated about midway between Rockville and Norbeck with a frontage of some four thousand feet on the Norbeck Road and bounded by County park ground to the West and North, the (former) McIntosh tract to the East, and the Norbeck Road to the South * * *."

It is conceded that this description would embrace the land of both Marcus and Aaron. The Marcus tract contained approximately 107 acres while the Aaron tract contained approximately 91 acres. Aaron originally owned the entire tract. He conveyed a portion thereof to Marcus at some point prior in time to that in issue. Aaron is a physician. Marcus is a dentist.

Marcus and his wife contracted through a broker by the name of Leder on September 3, 1964, to sell the 107 acre portion. Aaron and his wife contracted through the same broker to sell the remaining portion of the land. The contract was dated December 5, 1964, although the claim is made that Aaron executed it on December 7, 1964, five days after the expiration of the exclusive listing agreement. Settlement was made. Garfinkel and Sampson received no commission.

Garfinkel and Sampson filed suit in the Circuit Court for Montgomery County against Aaron and Marcus and their respective wives based on the listing contract of June, 1964. The declaration contained two counts. The first count was based upon their allegation that they produced a buyer pursuant to the contract terms and that the defendants refused to make sale. The second count claimed breach by defendants of the exclusive listing agreement by a sale to Manor Lake Corporation "at and for the total purchase price of $630,000". Damages in the amount of $66,450.00 were claimed in each count.

The claim of Mr. Sampson was ordered dismissed without prejudice at the same time that the original attorneys for the plaintiffs sought to withdraw from the case on the basis of personality clashes which had arisen between them and Garfinkel. New counsel was obtained by Garfinkel for trial. He apparently ultimately disagreed with them since the order for appeal to this Court was entered in proper person and his third set of counsel appear here.

The matter came on for trial before a jury. The trial judge at the end of the plaintiff's case granted the motion of all defendants for a directed verdict as to the first count and granted a similar motion of the respective wives as to the second count. Ruling was reserved as to Aaron on the second count. Aaron and Marcus rested without presenting evidence and renewed their motions. Motion was, thereupon, granted for a directed verdict on the second count as to Aaron. The jury returned a verdict in favor of Garfinkel against Marcus in the amount of $17,387.50. Garfinkel and Marcus appeal. We shall affirm the judgments.

Marcus presents five questions on appeal, namely (1) whether the trial court should have granted his motion for a directed verdict on the ground that the exclusive listing agreement upon which Garfinkel's suit was brought is too uncertain and indefinite to be enforceable, (2) whether the trial court should have granted the motion of Marcus for a directed verdict on the ground that there was no legally sufficient evidence to support Garfinkel's claim that Aaron Schartzman was acting as the agent of Marcus Schwartzman at the time Aaron signed the exclusive listing agreement, (3) whether the trial court should have granted the motion of Marcus for a directed verdict on the ground that there was no legally sufficient evidence that Garfinkel had knowledge of and relied upon either actual or implied authority on the part of Aaron to execute a listing agreement in behalf of and as agent for Marcus, (4) whether the trial court should have granted Marcus' motion for directed verdict on the ground that Garfinkel failed to establish the existence of a valid real estate broker's or salesman's license issued to and held by his co-broker, Harold Sampson, prior to acceptance of the exclusive listing agreement on June 2, 1964, and (5) whether the listing agreement included any authority from Aaron to the brokers to offer for sale the property of anyone other than Aaron, or was the description of the property as "approximately 200 acres" an inadvertent mistake on the part of the draftsman.

Garfinkel presents four questions, namely (1) whether the direction of a verdict in favor of Aaron was error, (2) whether the execution by Aaron of an exclusive listing agreement for

the sale of 200 acres bound Aaron irrespective of his ownership or lack of ownership of the land referred to in the listing agreement, (3) whether the sale of a part of the 200 acres within the period of the exclusive listing agreement constituted a breach of the listing agreement and rendered Aaron liable for damages, and (4) whether the proper measure of damages for such a breach was a sum equal to the commission which would have been earned.

Garfinkel testified that, in conjunction with another individual who thought that Aaron might be interested in selling, he first had contact with Aaron in the spring of 1963. Aaron at that time indicated an interest in selling. He rejected a contract for $5000.00 or $5500.00 per acre. Garfinkel described the land as "raw acreage". Garfinkel never met Marcus until a year after his initial contact with Aaron, nor did the name Marcus come into the original discussion. Garfinkel ultimately arranged a meeting with Aaron and Harold Sampson in late January or February of 1964. Garfinkel testified:

> "The doctor provided me with facts of the ground . . . I mean [plats] of the ground, this is my first clear recollection that we were dealing with a two hundred acres of tract. Because the [plat] he gave me embraces both tracts."

The record then reads:

> "Q. Doctor Aaron gave you the [plats]? A. Yes. This was done to get a preliminary idea of how development might work out in terms of cost from an economical standpoint, and they gave me an appraisal of that.
> "Q. This was handled by you? A. Yes.
> "Q. At the direction of whom? A. Doctor Aaron Schwartzman."

Prior to the introduction of Sampson to Aaron, Garfinkel had suggested to Aaron that Aaron proceed with his own development of the land, after his having rejected certain other development plans. It was for that reason, it was claimed, that plats were involved. Garfinkel said he was shown a plat by

Aaron that showed two separate parcels of land making up the 200 acres with the name of Marcus on one portion and the name of Aaron on the other. At another point the record reads:

"Q. Did Doctor Marcus Schwartzman direct you in your activities? A. No, I never saw him.

"Q. Never saw Doctor Marcus Schwartzman? A. No.

"Q. You were dealing with Aaron all of the time? A. Yes.

"Q. With how many acres? A. For the first time I have a clear recollection. He gave me a [plat] and I remember very distinctly when the engineer gave me their preliminary analysis. The sum of it was while storm sewers for one tract would be higher [than] for the other it would just even out on the board and from this I distinctly recall we were dealing with two tracts."

Garfinkel said an application for rezoning was filed based on this 200 acre tract. The description for the listing contract was taken from such a plat, there apparently being a number of plats which Garfinkel examined.

Harold Sampson testified that Garfinkel introduced him to Doctors Aaron and Marcus Schwartzman. At one point the examination of Sampson is as follows:

"Q. Tell us, please, when and where you first met Doctor Aaron Schwartzman? A. I believe it was at his farm; I believe it was a Sunday afternoon; I'm sure it was Sunday Afternoon when I met Doctor Aaron Schwartzman and Doctor Marcus Schwartzman.

"Q. Was Mr. Garfinkel present at that meeting? A. Yes.

"Q. He introduced you in fact? A. Yes.

"Q. What discussion, if any, did you have with Doctor Aaron Schwartzman concerning their land, if you recall at that time? A. Well, we . . . the doctor showed us his home and the property and boundaries

and so forth of the entire tract. And we discussed the feasibility of developing it and how many homes you could build on it and what the development cost would be and so forth.

\* \* \*

"Q. Now, with whom did you hold these discussions? Were you talking to one or both of the doctors? A. At that initial meeting it was both.

"Q. Both heard what proposals that you had? A. Yes. However, to qualify that, you cannot determine that the development costs were going to be; yes I discussed it with both, the feasibility of the development.

\* \* \*

"Q. Did you, at that initial meeting, hear any reference to the amount of acreage involved, sir? A. Yes, 200 acres, plus or minus. I believe there was a small piece of condemnation; it was plus or minus a few acres.

"Q. Any discussion for the development for less than 200 acres? A. No.

"Q. 96 acres, for instance? A. No. I called and met Doctor Marcus Schwartzman and he showed me his property lines and Doctor Aaron Schwartzman showed me his and we combined them altogether.

\* \* \*

"Q. Did you have any agreement, tentative or otherwise at the end of that meeting as to the amount of acreage you would deal with in the development of this property? A. Yes, 200 acres. It was always 200 acres. It was not feasible, which I can show you with the proposed development plans. This land was not economically feasible to subdivide it into acre tracts; there were too many factors involved. Even if the land was to be sold to as one parcel, because one standing on his own was not . . . Doctor Marcus' had a gas line running through the hill. Now, to develop around that and come out with a good street and work out and take best . . . if you have an entire package of 200

acres where you can work this into it, and also for example: On sewer lines, the large trunk sewer line had to go through one property to get to the other. It made sense that they brought or were together, and a school site was to be located there and if you work the two together you could . . . anyway, it would serve more people . . . ."

Sampson on cross-examination testified that he knew the first day he went on the land that there were two tracts of approximately 100 acres each. He said Dr. Aaron Schwartzman showed him the property lines from the house, it being on a hilltop. Dr. Marcus Schwartzman and Sampson walked over the land and Marcus showed him "the corner points of his property".

The testimony of Sampson relative to the exclusive listing agreement was in part as follows:

"Q. Would you tell the Court and jury if you please, the circumstances leading up to the execution of that agreement? A. Prior to getting to the point of making a determination of Doctor Schwartzman or to sell the land versus the land development method, I had worked with Doctor Aaron Schwartzman and engaged engineers, land planners, scheduled and talked with zoning attorneys, had prepared preliminary studies, site plans of the entire tract. And again, the purpose of this was, we were acting as advisors to Doctor Aaron Schwartzman as to what is the best thing to do here, how can I make the most money out of the land. And first we had to determine what the development was going to cost and I have here the copy and the figures that I gave to Doctor Aaron Schwartzman at the time. And if you saw the land, this is what you would earn if you developed the land; I can give you those figures. Here is what you would earn if we get the land at least part of it zoned and in what you would earn. We weighed out the various things. Could I refer to my notes, I would like to make a point and elaborate on the point whether to sell this land."

## SCHWARTZMAN'S APPEAL

### I

Marcus claims the exclusive listing agreement is a nullity because it "fails to state the terms upon which the Seller agrees to sell his property, and is, therefore, incapable of interpretation to ascertain either the intent or understanding of the parties thereto".

The listing agreement specifically described the property in question. The price was "Seven thousand, five hundred dollars per acre, as it is, with no contingencies." It states that the terms of sale are "to be negotiated".

Fundamentally, the argument of Marcus is that the contract with the broker failed to state what terms other than price will be required of a customer, pointing out that even if a purchaser proposed to pay all cash for the property this would not remove the cloud of indefiniteness and uncertainty since for tax or other reasons a seller might not deem cash advantageous.

We are not presented in this case with a situation where a landowner is seeking to extricate himself from an exclusive agency contract or exclusive sale agreement during the term thereof. We do not have before us a situation where Garfinkel as broker has produced a buyer willing to pay the listed price of $7500.00 per acre, but the parties are unable to agree on other terms and Garfinkel as broker is suing the owner for breach of the contract, the owner having refused to convey. What we do have is a situation in which a part of the property covered by the contract has been sold during the period of the contract on terms that must have been acceptable to the seller or no sale would have been made.

Examination of the contract reveals that it is in two parts. One part gives the brokers what they call an exclusive listing. The other part provides for commissions. We note that *Restatement, Agency* 2d, § 445, comment d (1958) states:

> "d. *Effect of completeness of terms given broker.*
> The principal may either specify all his terms or furnish the broker with only part of the terms, the price, for example, with the understanding that further details

are subject to negotiation between the principal and the customer when found.

\* \* \*

. "When the principal has furnished the broker with only part of the terms, with the understanding that further details are subject to negotiation between the principal and the customer, the principal, unless acting in bad faith \* \* \* is free to terminate such negotiation [with the *customer*] without liability to the broker."

Had Garfinkel produced this purchaser and Marcus accepted the terms, Garfinkel would have been entitled to his commissions. The parties pledged themselves to co-operate with other brokers. There was an exclusive listing. Another broker during the listing period produced a purchaser on acceptable terms.

Generally, when a contract contains ambiguous terms, an attempt is made to determine the intention of the parties at the time the contract was entered into. *Mascaro v. Snelling and Snelling,* 250 Md. 215, 229, 243 A. 2d 1 (1968). In addition, the rule applicable here was stated in *Balto. City v. Indus. Elec.,* 230 Md. 224, 229, 186 A. 2d 469 (1962) to be that "an interpretation which makes a contract fair and reasonable will be preferred to one leading to a harsh or unreasonable result, so that a reading which produces a forfeiture will not be favored. WILLISTON ON CONTRACTS (3rd Ed.), Sec. 620; *Carozza v. Williams,* 190 Md. 143, 150." An interpretation which renders a contract valid and its performance possible will be preferred to one which makes it void or its performance impossible or meaningless. 4 Williston, *Contracts,* § 620 (3rd Ed. 1961).

The contract was a valid one.

II

Marcus claims there was no legally sufficient evidence from which the jury could properly find the existence of an agency on the part of Aaron authorizing him to act for Marcus in the execution of the listing agreement.

The trial court instructed the jury:

"Apparent authority is that authority which the principal has held the agent out as possessing or which he

has permitted his agent to represent that he possesses and which the principal may not, therefore, deny.

\* \* \*

"An agent's act is within his apparent authority when a reasonably prudent person, having knowledge of the usages of a business, would be justified in supposing from the character of the agent's known duties that the agent is authorized to perform such act. In order for a third person to avail himself of the apparent authority of an agent he must have dealt with the agent in good faith, relying upon the agent's apparent authority in the exercise of reasonable prudence, and he cannot hold the principal liable on the basis of the apparent authority of an agent unless the acts and conduct of the principal which justify the inference of agency are known to, and relied on by, him."

Marcus did not except to any of the trial court's instructions. On appeal, however, he raises the question of the legal sufficiency of the evidence to sustain the jury's findings in keeping with his original motion for a directed verdict.

The trial court's instructions essentially ask the jury to decide whether or not there exists an agency by estoppel. *Restatement, Agency 2d,* § 8B (1958) states:

"(1) A person who is not otherwise liable as a party to a transaction purported to be done on his account, is nevertheless subject to liability to persons who have changed their positions because of their belief that the transaction was entered into by or for him, if

(a) he intentionally or carelessly caused such belief, or

(b) knowing of such belief and that others might change their positions because of it, he did not take reasonable steps to notify them of the facts."

Comment c provides in pertinent part:

"*Estoppel by silence.* In many situations one may be deprived of a right of action, be subject to an action, or even lose his property by failing to reveal the truth

if he knows that another is acting or will act under a misapprehension. * * * There may even be liability based on a failure to speak, as where one knows that another is purporting or has purported to contract as his agent or to receive money on a forged instrument, and fails to reveal the facts. * * * In some situations in which silence is maintained, authority * * *, or ratification * * * results, and, if so, liability can be based upon ordinary agency principles. In situations in which neither authority nor ratification can be found, there may be liability based upon estoppel if the other party has changed his position."

Compare 1 Mechem, *Agency,* §§ 245, 246 (2nd Ed. 1914), to the same effect.

The doctrine of agency by estoppel has been adopted in Maryland. See *Abuc Trading Etc. Corp. v. Jennings,* 151 Md. 392, 410-11, 135 A. 166 (1926) ; *White v. Friel,* 210 Md. 274, 284, 123 A. 2d 303 (1956) ; *Reserve Ins. Co. v. Duckett,* 240 Md. 591, 600, 214 A. 2d 754 (1965), appeal after remand 249 Md. 108, 115, 238 A. 2d 536 (1968) citing, among other authorities, *Restatement, Agency 2d,* § 8B (1958). *Cf. Bean v. Steuart Petroleum,* 244 Md. 459, 224 A. 2d 295 (1966).

The jury here could have found that early in the negotiations Aaron mentioned 200 acres, that he presented plats for a total of 200 acres with his and his brother's names on adjoining parcels, that the brokers met Aaron and Marcus, that Marcus walked the boundary lines with one of the brokers while Aaron pointed out his lines from a hilltop, that discussion was of development of the entire tract, and that rezoning applications for the entire 200 acres were submitted through Aaron.

We must assume the truth of all evidence tending to sustain Garfinkel,. against whom the motion was directed, as well as all inferences of fact reasonably and fairly deducible therefrom. If there is any relevant and competent evidence from which a rational mind could infer a fact in issue, then a directed verdict should not be granted. *Metropolitan Auto Sales v. Koneski,* 252 Md. 145, 155, 249 A. 2d 141 (1969) and cases there cited.

The testimony of Garfinkel and Sampson relative to the acts

and statements of Aaron and Marcus was sufficient to support a determination of an agency by estoppel. It was for the jury to decide.

## III

Marcus contends, "There is a complete absence of any evidence upon which the jury could properly find that [Garfinkel] knew of either an actual or an implied agency on the part of Aaron authorizing him to act for Marcus in the execution of the listing agreement, or that [Garfinkel] relied upon any such agency."

The portions of the testimony which we have quoted constituted sufficient evidence for the jury to find that Garfinkel relied on an agency relationship between Marcus and Aaron. Garfinkel's testimony indicates that at the time the listing contract was entered into he knew that the entire 200 acre tract was owned by the two brothers, Marcus and Aaron, each separately owning approximately 100 acres. Nevertheless, the contract was signed by only one brother, listing the entire 200 acres.

There was no need for the evidence to show the existence of an actual agency upon which Garfinkel relied. Since the evidence showed facts sufficient to support an agency by estoppel, proof of the existence of an actual agency agreement was unnecessary. Agency by estoppel implies the existence of an agency and precludes Marcus from claiming that the jury could not find its existence. There was evidence upon which the jury could find that Garfinkel "knew that he (Garfinkel) relied on an implied agency". Referring again to *Restatement, Agency 2d,* § 8B heretofore quoted, there was presented evidence from which there could be found an implied agency by estoppel and the evidence indicates that those facts were known to Garfinkel.

## IV

Marcus contends that the trial court erred in denying his motion for a directed verdict because Garfinkel failed to establish the existence of a valid real estate broker's or salesman's license "issued to and held by his co-broker, Harold Sampson, prior to acceptances of the Exclusive Listing Agreement on June 2, 1964", a license being required under Code (1964 Repl.

Vol.) Art. 56, § 228. See in this regard our recent decision in *Thorpe v. Carte,* 252 Md. 523, 250 A. 2d 618 (1969).

Garfinkel contends this point was not raised in the trial court and, therefore, under Maryland Rule 885 is not properly before this Court.

No points and authorities filed by any of the parties are included in the record nor are any of the arguments relative to the motion to dismiss. Therefore, there is nothing in the record to show that the matter was affirmatively considered by the trial court. It may be significant that Schwartzman did not file any reply brief when Garfinkel said the point was not raised in the trial court.

Assuming *arguendo* the point was raised below, then in considering the motion for a directed verdict the trial judge could have noted that the declaration set forth that Messrs. Garfinkel and Sampson "were real estate brokers, duly qualified and licensed to sell real estate in the State of Maryland". He could have further noted that on direct examination Sampson was asked his "occupation or profession". His reply was, "I am a Real Estate Broker and building and developing." He had previously testified that he had "a real estate office there in Hyattsville."

12 Am. Jur. 2d, *Brokers,* § 178, par. 2 states:

> "In a number of jurisdictions, statutes * * * are to be found which in express terms declare that no action can be maintained for recovery of compensation by a broker without * * * proof that he was duly licensed * * *."

The Maryland statute does not in its terms require proof. A somewhat analogous, but not completely analogous, case was before our predecessors in *Walkling v. Ensor,* 138 Md. 496, 114 A. 484 (1921) in a suit by a real estate broker for commissions. There he had failed to allege in his pleadings that he held a broker's license. He was permitted over the objection of the defendant to testify that he held a license. Judge Adkins for the Court said:

> "We must presume that if there had not been a license, counsel for the defendant would have proved

that fact by records, known by him to be in the very building in which the case was being tried, and that he would not have stood on a mere technicality, the force of which was, to say the least, debtable." *Id.* at 502.

More recently in *Mirabile v. S.R.C.,* 247 Md. 492, 231 A. 2d 693 (1967) Judge McWilliams said for the Court:

"We think Mirabile was entitled, at the opening of the trial in the court below, to the benefit of the presumption that the law has been obeyed, that every man will conduct his business in conformity with the law, that an individual intends to do right rather than wrong and that he intends to do only what he has a right to do." (citing authorities). *Id.* at 498.

It would have been preferable for Sampson to have positively testified as to the existence of a license. We believe, however, that one could reasonably draw the inference from his testimony that he was licensed.

V

The final argument of Marcus is that "the listing agreement, prepared by [Garfinkel], clearly refers only to property of Aaron and not to that of Marcus; it does not purport to bind Marcus nor to create any liability on his part; and, having been drawn by [Garfinkel], it must be most strongly construed against him." It is the claim of Marcus that the agreement deals only with Aaron's property, it is worded in the first person singular and so executed, and that nowhere on the face of the document is there any indication that Aaron, in executing the agreement in his own name, dealt or intended to deal for Marcus as well as for himself.

In II and III we have discussed the existence of an agency relationship between Marcus and Aaron. The testimony of Garfinkel and Sampson, as indicated, was to the effect that from the beginning it was the 200 acre tract about which the parties were talking and that the contract was prepared from the plat of that 200 acre tract submitted by Aaron. There was further testimony as to Marcus' walking the boundary lines with one of the brokers. The jury was instructed to decide whether the

listing contract was entered into for the full 200 acres. Marcus took no exception to that instruction. The jury apparently found no mistake and apparently found an agency relationship between Marcus and Aaron.

It is true, as Marcus states, that the agreement does not specify that it binds Marcus or that it creates a liability on his part. The finding that Aaron was the agent of Marcus binds him and creates a liability on his part without so stating in the agreement. It is elementary that the act of an agent within the actual or apparent scope of his authority will bind the principal. *Lister v. Allen,* 31 Md. 543 (1869). Mechem, *Agency,* § 462 (3rd Ed. 1923) states in pertinent part:

> "Where a written contract is made in the agent's name, the agent, as has been seen, may usually be held upon it, and he cannot escape by showing that it was made for a principal. But in such a case, if the contract be not a negotiable instrument or an instrument under seal, the other party, upon showing that it was really made for and by the authority of the principal, may, if he chooses, hold the principal * * *."

## GARFINKEL'S APPEAL

### I

Garfinkel first contends that the trial court erred in directing a verdict in favor of Aaron with respect to Aaron's liability for commissions.

The listing agreement was effective June 2 and expired December 2. Aaron was approached by a prospective purchaser in August. Garfinkel introduced into evidence the deposition of the broker who handled the sale of Aaron's property. He testified that he had been aware of the Schwartzman property for about six years prior to 1964, having met Aaron as far back as 1958 or 1959, that early in 1964 he talked with Aaron relative to sale of the entire 200 acres, not being aware at that time that Marcus owned a portion of it and having assumed during the entire five or six years that Aaron owned the whole of it. He obtained a contract with Marcus in September of 1964 but Aaron at that time told him his property was tied up until

December 2, 1964. This broker ultimately obtained a contract for the sale of Aaron's land on December 7, 1964, under date of December 5.

The listing agreement with Messrs. Garfinkel and Sampson provided that the brokers became entitled to a commission "in the event of the procurement of a buyer (within the period of this listing) by any one or more of the parties to this agreement." It is the contention of Garfinkel that because Aaron was approached in August, 1964, by the party to whom he contracted to sell in December, 1964, that "the purchasers of the property had been procured by Dr. Aaron Schwartzman, even though it was through the offices of an agent of the purchaser" and the date of the execution of the contract for sale, which resulted from the procurement in August, was of no moment in the case, and any instruction by the Court should not have limited the recovery to only a part of the land."

The testimony is entirely clear that the ultimate purchaser was *not* procured by Aaron. Therefore, the contention is without merit.

II

Garfinkel contends that when Aaron executed the exclusive listing agreement for the sale of 200 acres it bound him irrespective of his ownership or lack of ownership.

Garfinkel points to *Jones v. Adler,* 34 Md. 440 (1871) wherein our predecessors held that where a broker is employed to procure a purchaser, and through his agency, negotiations are begun and sale is finally effected, the broker may recover his commissions from the party at whose instance and request the services were rendered, whether he held the legal title of the property *beneficially,* or in trust for his wife.

The general rule is that a contracting party may sue either the agent or the undisclosed principal (once disclosed) Mechem, *Agency,* § 462 *supra; Hospelhorn v. Poe,* 174 Md. 242, 198 A. 582 (1938). In *Hospelhorn* Judge Parke speaking for the Court further said:

> "If the third party contract with an agent for an undisclosed principal, he may hold the agent or, upon discovery, the principal, but *the third party cannot*

> *recover from both.* If the third party elects to hold the agent, the principal is discharged; and, conversely, if he elects to hold the principal, the liability of the agent is at an end." (emphasis added) *Id.* at 261.

It is obvious that what Garfinkel here seeks is to recover his commissions on the sale of the Marcus tract from both Marcus and Aaron. This he may not do. He has his judgment against Marcus.

III

Garfinkel next alleges error in that he says the contract of sale for a part of the 200 acres was a breach of the exclusive listing and rendered Aaron liable for damages. This is but a variation of his second contention which we have found without merit.

Garfinkel claims he and Sampson could have sold the property. This record is devoid of any evidence, despite assertions in Garfinkel's brief to the contrary, that Messrs. Garfinkel and Sampson would have become entitled to commissions prior to the expiration of the listing agreement. It is true that Garfinkel testified that in November of 1964 he produced a buyer at the price indicated in the listing agreement. The buyer was identified as Albert G. Van Metre, Garfinkel having stated that he submitted on Van Metre's behalf a verbal offer to Aaron and having further identified Van Metre as a prospect of Sampson.

The deposition of Mr. Van Metre was read into the record. He stated he did not know and had never met Garfinkel. He knew Mr. Sampson but stated that Sampson had never submitted to him any properties for purchase. He was then asked whether Mr. Sampson ever showed him or discussed with him the Schwartzman properties which he answered in the negative. He then categorically denied ever having expressed either to Mr. Sampson or to Mr. Garfinkel any interest in the purchase or the possible purchase of the lands owned by Aaron and Marcus in Montgomery County, Maryland. Accordingly, we conclude there was no evidence to support a contention that Garfinkel and Sampson would have become entitled to the commissions before the expiration of the listing agreement.

## IV

Finally, Garfinkel contends that the proper measure of damages for the breach was the sum equal to the commission which would have been earned, contending that the trial judge erroneously instructed the jury that he was entitled to only 50% of the commisions. Despite the admonition of Maryland Rule 554 d that a party who "has an objection to any portion of any instruction given * * * shall * * * make such objection stating distinctly * * * the ground of his objection * * *", the objection at trial was as follows:

> "We respectfully object to the Court's instructing the jury as to Garfinkel's right to recover only fifty per cent of any commission which the jury might find were recoverable, if in fact they conclude that an agency relationship did exist."

Rule 554 e provides:

> "Upon appeal a party in assigning error in the instructions, shall be restricted to (1) the particular portion of the instructions given or the particular omission therefrom or the particular failure to instruct distinctly objected to before the jury retired and (2) the grounds of objection distinctly stated at the time; and no other errors or assignments of error in the instructions shall be considered by the Court of Appeals."

Accordingly, the objection is not before us, no grounds therefor having been stated.

*Judgments affirmed; costs to be paid by appellants in each case.*