## D. C. TRANSIT SYSTEM, INC., *v.* BROOKS

[No. 205, September Term, 1971.]

*Decided February 22, 1972.*

The cause was argued before HAMMOND, C. J., and BARNES, SINGLEY, SMITH and DIGGES, JJ.

*Frank F. Roberson,* with whom was *Kevin P. Charles* on the brief, for appellant.

*Donald P. McLaughlin* for appellee.

SMITH, J., delivered the opinion of the Court.

*For the want of a nail the shoe was lost,*
*For the want of a shoe the horse was lost,*
*For the want of a horse the rider was lost,*
*For the want of a rider the battle was lost,*
*For the want of a battle the kingdom was lost—*
*And all for the want of a horseshoe nail.*

Poor Richard's Almanac—Benjamin Franklin

Little things were translated into big things in this case where a 15 cent fare dispute resulted in the entry of a judgment which included $20,000 for punitive damages against appellant, D. C. Transit System, Inc. (D. C. Transit). It here appeals the punitive damage portion of that judgment. There was an award of $10,000 for false imprisonment and another of $10,000 for malicious prosecution. It does not appeal the awards for compensatory damages. We shall affirm the award relative to false imprisonment and reverse as to malicious prosecution.

We recite the facts bearing in mind that we are obliged to assume the truth of all evidence tending to sustain the party against whom a motion for directed verdict was directed, as well as all inferences of fact reasonably and fairly deducible therefrom. *Garfinkel v. Schwartzman,* 253 Md. 710, 722, 254 A. 2d 667 (1969). The request for an instruction that Brooks was not entitled to exemplary damages amounted to a motion for a directed verdict on that issue.

It all began when appellee Arthur Lee Brooks (Brooks) boarded a D. C. Transit bus in the District of Columbia. Fare to his destination at Mt. Rainier, Maryland, was 45 cents. Fare within the District of Columbia was 30 cents. Fare from the D. C. line to Maryland points was 30 cents. If he paid the full fare when he boarded in the District he should have paid 45 cents and identification would have been provided. A person boarding the bus and paying 30 cents would be obliged to pay an additional 30 cents when he got off in Maryland unless he had proof that he had boarded in the District since it would be assumed that he had boarded in Maryland.

When Brooks boarded the bus he paid 30 cents. When he got off in Maryland he put 15 cents in the fare box. He says he gave the driver a transfer at that time to indicate that he had boarded in the District, that this is the procedure he had been following. He claimed the driver told him the fare had gone up to 60 cents.

As is to be expected in such situations, the bus driver's version is different. He claimed Brooks put 15 cents in the fare box, that he didn't have any sort of a zone check, "not even a transfer," that he told Brooks the fare was 30 cents and tried to explain to him but "couldn't get a word in edgewise," that as soon as he said the fare was 30 cents Brooks started saying that he rode the bus every day, called the driver an abusive name, said he wasn't going to let the driver "rob him," that he "[knew] his rights," that when the driver asked him for his name he wouldn't even listen to that, that he said, "Let me off the bus or else." and then reached in his back pocket. Brooks denied that the driver asked him for his name.

A scuffle ultimately ensued between a passenger who was an employee of D. C. Transit and Brooks. Brooks claimed that before that scuffle began that the bus driver had said to him, "We are going to have you arrested." Brooks claimed that the driver then headed for the police department. He also said that during the scuffle between Chapman, the off duty D. C. Transit employee, and himself, the driver held him while the off duty employee hit him. He also claimed that the driver hit him with his fist from the back. "After they thought they had [him] under control then they took [him] to the police department."

Brooks said that at the police station Chapman, the off duty employee, had him by one arm and the driver by the other. At that point Chapman "reached in his pocket, pulled out a knife, put it in [Brooks'] left pocket, and said, 'We are going to fix you.' " This took place "right at the police door, at the stationhouse door." When they "got inside the door and the policeman was there, Mr. Chapman told the policeman that [Brooks] had a knife." The

driver's version is that he saw in Brooks' hand "what looked like the partial part of a handle to a knife," and that he told the police. They then found a knife on Brooks.

At the police station a D. C. Transit supervisor appeared, having been sent by the central dispatcher. A part of his duties was "to attend scenes of incidents" such as this. He advised the driver that it was against company policy to press charges for failure to pay fares. He also told the driver that the proper fare was 45 cents. Brooks says that the driver said, "Oh, I thought it was 60 cents." The supervisor testified that when he advised the driver that it was against company policy to press charges for nonpayment of fare the driver "said that it didn't matter, because he was leaving." The driver testified that his interpretation of company policy was that it was "more or less up to the operator's discretion" as to whether charges should be pressed in such situations, that this was what he "was taught in the training period [he] went through with D. C. Transit." As Brooks' declaration puts it, he was charged with "unlawfully refusing to pay his * * * bus fare." He was subsequently found not guilty.

In this action Brooks sued the driver, the off duty employee, and D. C. Transit. The off duty employee was never served and the action against him was dismissed. Only two counts in the declaration were actually submitted to the jury, the action for false arrest and the one for malicious prosecution. On false imprisonment the jury returned a verdict of $750 for compensatory damages against the driver and D. C. Transit, and $500 punitive damages against the driver and $10,000 punitive damages against D. C. Transit. On malicious prosecution its verdict was $450 compensatory damages against D. C. Transit, $100 compensatory damages against the driver, $250 punitive damages against the driver, and $10,000 punitive damages against D. C. Transit. The judgment ultimately entered was for compensatory damages of $750 against the driver and D. C. Transit on the false arrest count with punitive damages of $500 against the

driver and $10,000 against D. C. Transit. On the malicious prosecution count judgment was entered in the amount of $100 compensatory damages against the driver and D. C. Transit with $250 punitive damages against the driver and $10,000 punitive damages against D. C. Transit. Only D. C. Transit appealed. It does not contest the judgment for compensatory damages but contests only the punitive damage awards.

## FALSE ARREST

D. C. Transit urges that punitive damages should not be awarded against a carrier "when its bus driver for a short time detained a passenger whom the driver believed had not paid the proper fare." It suggests that nowhere in the evidence can there be found support for a finding of "actual malice" toward Brooks and claims that there must be a showing of "actual malice" to support an award of punitive damages.

In *Dennis v. Baltimore Transit Co.*, 189 Md. 610, 56 A. 2d 813 (1948), Judge Delaplaine discussed for the Court the issue of punitive damages for false arrest stating:

> "We specifically hold that, in a suit for damages brought by a passenger for false arrest made upon request of the conductor, it must be shown by the plaintiff in order to recover punitive damages that the conductor not only acted wrongfully but without just cause or excuse, and with the evil motive to injure and oppress, or at least with a reckless disregard of the rights of the person injured. *Smith v. Philadelphia, W. & B. R. Co.*, 87 Md. 48, 38 A. 1072; *Fotheringham v. Adams Express Co.*, 36 F. 252, 1 L.R.A. 474. Where the jury determine in a suit for false arrest that the arrest, even though unjustifiable, was requested in the honest assertion of a supposed right while in the discharge of duty, and was not from malice, punitive dam-

ages should not be awarded. *Philadelphia, W. & B. R. Co. v. Hoeflich,* 62 Md. 300, 307, 50 Am. Rep. 223." *Id.* at 617.

Judge (later Chief Judge) Henderson put it slightly differently for the Court in *Safeway Stores, Inc. v. Barrack,* 210 Md. 168, 122 A. 2d 457 (1956), when he said:

> "Although the allowance of punitive damages is somewhat anomalous and has been rejected in a few states, it has been generally recognized. *Prosser, Torts* (2d ed.), p. 9. It has long been recognized in Maryland. In *Bernheimer v. Becker,* 102 Md. 250, a case of assault and false imprisonment, it was said that to justify an award of punitive damages there must be circumstances tending to show that the wrong was inflicted maliciously or wantonly or with circumstances of contumely and indignity, citing *Sloan v. Edwards,* 61 Md. 89, 100. In *Heinze v. Murphy,* [180 Md. 423, 24 A. 2d 917 (1942)], a case of assault and false imprisonment against a policeman, it was said (p. 434) that 'where damages beyond compensation, to punish the party guilty of a wrongful act, are asked, the evidence must show wanton or malicious motive, and it must be actual and not constructive or implied.' " *Id.* at 176.

The facts we have set forth would constitute a sufficient basis for a jury to find that the driver was motivated by malice when he unlawfully detained Brooks. This includes Brooks' testimony that the driver started for the police station almost as soon as Brooks disputed the amount of the fare, Brooks' testimony as to the driver's assault upon him, and Brooks' assertion that the driver falsely accused him of having a knife in his possession. The fact that the bus driver was leaving the employ of D. C. Transit placed it in a difficult position from the standpoint of control. That fact can in no way alter

the basic situation, however, and that is that it was the employee of D. C. Transit who breached the contract for safe carriage by unlawfully depriving Brooks of his liberty. In *St. Michelle v. Catania*, 252 Md. 647, 250 A. 2d 874 (1969), Judge Singley said for the Court:

> "Restatement, *Agency* 2d (1958) § 214 adopts the idea that the carrier's responsibility to the passenger is a non-delegable duty, for the breach of which the carrier is liable:
>
>> 'A master or other principal who is under a duty to provide protection for or to have care used to protect others or their property and who confides the performance of such duty to a servant or other person is subject to liability to such others for harm caused to them by the failure of such agent to perform the duty.'
>
> Comment e to § 214 says, '* * * In situations coming within the rule stated in this Section, the fact that the one to whom the performance of the duty is delegated acts for his own purposes and with no intent to benefit the principal or master is immaterial.', thus laying to rest the idea that the doctrine of *respondeat superior* is controlling in such situations." *Id.* at 654.

Accordingly, the trial judge correctly refused to direct a finding favorable to D. C. Transit on Brooks' punitive damage claim under the false imprisonment count.

## MALICIOUS PROSECUTION

D. C. Transit urges that it should be relieved from punitive damages on the malicious prosecution count since the warrant was sworn out after the driver had been expressly advised by a superior that it was against company policy to prosecute for nonpayment of fare. It cites no cases from within or without Maryland in support of its position.

In *Drug Fair v. Smith,* 263 Md. 341, 346-47, 283 A. 2d 392 (1971), we recognized that to hold an employer liable for malicious prosecution by an employee it is essential that the act of prosecution be with the employer's actual or implied authority. We said "that the issue of whether a servant is acting within the scope of his employment is ordinarily a question for the jury," adding, however, "this is so, only if there is a factual dispute." We did not find such a factual dispute in that case. In *Safeway Stores,* cited in *Drug Fair,* Judge Henderson distinguished *Nance v. Gall,* 187 Md. 656, 51 A. 2d 535 (1946), and *Central Ry. v. Brewer,* 78 Md. 394, 28 A. 615 (1894), both malicious prosecution cases, because the acts complained of in those cases were not within the scope of the agent's authority. In *Central Ry.* the prosecution was of a passenger by agents of a carrier, but the passenger had actually left the car before he was approached relative to the counterfeit coin he was alleged to have deposited. Scope of employment as a factor in a malicious prosecution claim is discussed in, among other cases, *Bernheimer v. Becker,* 102 Md. 250, 255, 62 A. 526 (1905).

The critical question here is when the contract of carriage ended, since, as stated in *Restatement (Second) of Torts* § 314 A, comment c (1965), "A carrier is under no duty to one who has left the vehicle and ceased to be a passenger." This was implicit in the holding in *Central Ry. v. Peacock,* 69 Md. 257, 14 A. 709 (1888), where a carrier was held not liable for an assault by its conductor. The assaulted passenger had left the conveyance prior to reaching his destination for the purpose of reporting the conductor for misconduct. The assault took place on the street. The Court said:

> "The contract was to carry him as long as he stayed in the car to the end of the route—not to let him ride and walk alternately as he chose. Whilst the contract of carriage continues the passenger must to some extent be subject to

the carrier's control. The liability for his safety, and even for his conduct to co-passengers so requires. When he left the car the carrier was certainly not liable for his conduct on the street, nor for the conduct of a stranger to him on the street. Why then should the appellant be answerable for the assault of its driver, who actually stopped his team, and left it in the street with his passengers unguarded, in order that he might pursue his victim and knock him down. In doing this he cannot be regarded as acting within the sphere of his duty or scope of his authority. He left and stepped aside from both in order to gratify his spleen * * *." *Id.* at 264-65.

Here the passenger had not reached his destination. He had been delivered into the custody of the police and the off duty D. C. Transit employee swore out an assault and battery warrant against him. Whether this warrant was sworn out before or after the warrant relative to the alleged nonpayment of fare was taken out does not appear, but it is obvious from the circumstances here that the detention of Brooks was by police authority from the time that he entered the police station. Therefore, at that point the contract of carriage had terminated.

Since the contract of carriage had terminated prior to the time the warrant giving rise to the malicious prosecution claim was obtained, it follows that there could be no liability on the part of D. C. Transit relative to that warrant unless, under our prior holdings, the bus driver who obtained it was acting within the scope of his employment. In *Drug Fair* Judge Digges for the Court quoted earlier statements of this Court:

"The simple test is whether they were acts within the scope of his employment; not whether they were done while prosecuting the master's business, but whether they were done by the

servant in *furtherance thereof, and were such
as may fairly be said to be authorized by him."*
*Id.* at 350. (Emphasis added in *Drug Fair.*)

It clearly appears from the evidence here that the D.
C. Transit supervisor who went to the police station
numbered among his duties that of attending "scenes of
incidents" and that it was in that capacity that he went
to the Hyattsville police station. It is undisputed that
he advised the driver that it was against the policy of
the company to press charges for failure to pay fare. Ac-
cordingly, it follows that there is no factual dispute as
to whether the driver was acting within the scope of his
authority. We hold that under the circumstances here he
was not acting within the scope of his authority and,
therefore, there could be no claim for punitive damages
against D. C. Transit for the malicious prosecution.

## REVIEW OF AWARD FOR DAMAGES

D. C. Transit urges that it is entitled to a new trial
upon the ground of excessiveness since there was no
reasonable relationship between the amount of the puni-
tive and compensatory damages, seeing the jury as biased
because its verdict for compensatory damages on the
malicious prosecution count was $450 against D. C.
Transit and only $100 against the bus driver, a situation
that was adjusted by entry of a *remittitur.* It cites
*Conklin v. Schillinger,* 255 Md. 50, 257 A. 2d 187 (1969),
for the proposition that a trial court's power to set aside
a verdict which shocks its conscience is firmly estab-
lished in Maryland, a point not here in dispute. It has
cited no authority, however, for us to review the size of
the verdict.

D. C. Transit has cited authority from other jurisdic-
tions relative to ratios that should exist between compen-
satory damage and exemplary damage awards. The puni-
tive damage concept was set forth many years ago in
*Sloan v. Edwards,* 61 Md. 89 (1883), where Chief Judge
Alvey said for the Court:

"In all cases of personal wrongs, the general rule is, if the injury has been inflicted maliciously or wantonly, and with circumstances of contumely or indignity, the jury are not restricted to actual or compensatory damages, but may give, in addition thereto, such exemplary or punitive damages as the circumstances of the case will warrant. And, in such cases, the pecuniary circumstances of the defendant are proper to be considered. An amount that might be extremely punitive and severe to a defendant of small or moderate means, would be light and trivial to a defendant of very much larger means; and hence the pecuniary circumstances of the defendant are proper to be considered in estimating the damages. *Meibus v. Dodge,* 38 Wis. 300." *Id.* 100-01.

In *Rephann v. Armstrong,* 217 Md. 90, 141 A. 2d 525 (1958), this Court said:

"The trial court refused a new trial sought on the ground that the verdicts were excessive, and it is not our function or right, even were we disposed to do so, to pass on his action in this respect." *Id.* at 93.

More recently in *Kirkpatrick v. Zimmerman,* 257 Md. 215, 218, 262 A. 2d 531 (1970), Judge Finan said for the Court:

"We know of no case where this Court has ever disturbed the exercise of the lower court's discretion in denying a motion for a new trial because of the inadequacy or excessiveness of damages." *Id.* at 218.

He then went on to cite 14 cases with the comment, "to cite but a few."

Accordingly, we find without merit the arguments of D. C. Transit that there should be some ratio between the

judgment for compensatory damages and the judgment for exemplary damages and that we should order a new trial because of the size of the judgments.

> *Judgment as to punitive damages for false arrest affirmed; judgment as to punitive damages for malicious prosecution reversed and case remanded for entry of judgment in accordance with this opinion; appellant to pay the costs.*